## R. LEACHMAN *v.* H. MUSGROVE, Auditor.

1. MILITARY GOVERNMENT IN MISSISSIPPI — WHEN IT EXPIRED — THE PROVISIONAL STATE GOVERNMENT.—The military government of Mississippi, established by act of congress, and the provisional state government as an adjunct to it, expired on the 23d February, 1870, the date of the act of congress to admit her senators and representatives to seats in congress.

2. CIRCUIT JUDGES UNDER MILITARY APPOINTMENT CONTINUED IN OFFICE AND ENTITLED TO COMPENSATION UNTIL 22D APRIL, 1870. — Circuit judges under military appointment in Mississippi in office on the 23d February, 1870, continued to hold over until the abolition of their respective districts and dispensation with their services, by act of the legislature of 22d April, 1870, which created fifteen circuit court districts, destroying those formerly existing; and their right to compensation, as provided by law, continued until that date and terminated then.

3. MILITARY APPOINTEES IN OFFICE 23D FEBRUARY, 1870, NOT REQUIRED TO TAKE CERTAIN OATH. — Military appointees in Mississippi in office on the 23d February, 1870, were not embraced in the requirement of the 2d section of the act of congress for the admission of Mississippi to representation in congress, that state officers should take the oath therein prescribed.

ERROR to the circuit court of Hinds county, 1st district. BROWN, J.

The opinion of the court so fully presents the facts of this case as to relieve from the necessity of any other statement of it.

*W. P. Harris*, for plaintiff in error.

The case stated presents two questions: 1st. Does the act of congress, ratifying the constitution of the state and

admitting her into the union, and prescribing the oath to be taken by civil officers of the state, apply to officers of the provisional establishment under the reconstruction acts, or only to the officers of the permanent establishment under the constitution then ratified. 2d. Whether the judges under the provisional establishment continued in office until the appointment of judges to succeed them, or only until the districts were reconstructed. That is to say, was the provisional judiciary displaced before judges were appointed under the new constitution.

The act of the state legislature of 22d April, 1870, did abolish the eighth judicial district by dividing it into other districts, but no judge or judges to the new districts were appointed under the constitution until the 11th of May, 1870. The thirty days after the passage of the admission act of the 23d of February, 1870, expired on the 25th of March, 1870, and Leachman failed to take the oath prescribed by that act.

In construing the act of congress we should look at the conditions under which it was passed and its objects. The provisional government of the reconstruction acts was about to be displaced by a permanent government, to be organized under the constitution then submitted to congress for ratification. That constitution made effectual provision for the displacement of the provisional machinery, offices and officers. The sixth article provided for the organization of the judiciary. The state was directed to be divided into convenient districts, the qualifications of judges prescribed, the jurisdiction of the court defined, and the judges were to be appointed by the governor by and with the advice and consent of the senate. The twelfth article, section six, provided that the terms of all county officers, which include judges of probate, clerks of courts, and a multitude of other officers, shall expire in thirty days after the ratification of the constitution, and that their successors shall be appointed by the governor with the advice of the senate. Under the act of congress of the 10th of April, 1869, called the resub-

mission act, a legislature, a governor, secretary of state, and other state officers had been elected. The legislature had assembled and adopted the amendments to the constitution of the United States.

The reconstruction acts had given to the military commander the power to appoint to and remove from office all the officers of the state, and the ninth section of the act of July, 1867, provided that the officers so appointed or holding office under such authority should take the oath prescribed for officers of the United States, and that oath was the oath prescribed by the act of July 2, 1862 (2 Brightly, 470, § 1), popularly known as the "iron clad," an oath which comprehends all other oaths prescribed. All the officers of the provisional government held their offices under these laws, and if there is any efficacy in an oath of office congress had certainly secured it. Under these conditions the "admission act" was passed, and the next inquiry is, what was the motive or purpose of the provision of that act which has been quoted? The state constitution, it is true, had prescribed an oath, the legal effect of which embraced the disabilities created by the fourteenth amendment, but the terms of the oath were such as to leave it to the judgment and conscience of the officer whether the fourteenth amendment was part of the constitution. He was required to swear that he was not disqualified "by the constitution of the United States" and, unless the fourteenth amendment should become part of the constitution legitimately, there was nothing in the constitution of the United States which created disqualification. As matter of history it is known that much uncertainty prevailed as to the oath which the members of the legislature should take. They met under the reconstruction acts. The state constitution was not obligatory until congress should accept it. This uncertainty, and the dubious nature of the oath prescribed in the state constitution, induced congress to provide an oath which embraced the disabilities created by the fourteenth amendment, which, by designating the particular acts constituting disability, put

all evasion out of the question. That body was solicitous that the new state government should be strictly guarded against all unfriendly influences, especially of officers disloyal to the principles of the new order of things.

It was thought to be important that the new government should be in its inception in the hands of those who had evinced no hostility to the United States, and who had not shown a readiness to disregard the oath to support the national constitution. In other words, that body, as we know, had a strong desire to have the institutions of the state moulded by friendly hands. The state constitution was thought inadequate in this respect, and the oath was prescribed to remedy the defect. This was the manifest purpose of the provision quoted. The congress had shown that it was content with the oath prescribed by the act of July, 1862, for the officers of the provisional government, and with the officers appointed, the administration of the state, under the reconstruction acts by the military commander, had resulted in the re-organization of the state on principles satisfactory to that body. There was no mischief to remedy in that respect, the military commander was fully trusted and had performed his work well. The provisional machinery had accomplished its purpose. He was not likely to have appointed to, or continued a dangerous man in, office. The popular election, however, may have put in office men of doubtful loyalty. The officers of the provisional establishment could exert no influence over the new government. Their days were numbered. The curtain was about to drop upon them, and the machinery to which they belonged. Congress addressed itself to the government to which it was about to give its sanction and make permanent. This was the subject before it. It looked to the future and not to the past, to the new and not to the old order of things; that body was indifferent as to the machinery and the policy of which the new constitution and government were the fruits. It is impossible to find a rational motive for meddling with the temporary government which the

state constitution was about to displace; there existed no public necessity, nor any party exigency, nor resentment which could give rise to any legislation respecting the temporary establishment. It does, indeed, seem to impair the dignity of the measure by which a state of the union was admitted to representation, and her constitution and form of government ratified, to suggest that it had, in addition to these high and solemn purposes, a purpose to rearrange any part of the temporary government then fast fading out.

Again, looking at the language of the act, we find nothing to indicate a purpose to deal with the provisional officers. Congress seems not to have regarded these officers as officers of the state. The language of the ninth section of the act of July, 1867, seems to treat them more as officers whose authority emanated not from the state, but indirectly from congress, and it is too plain for dispute, that it was dealing with the constitutional officers of the state, those created by the constitution before it. The provision of the admission act before quoted, in designating the officers who are to take the oath prescribed in that act, mentions members of the legislature and all officers of said state. There is a difference between state officers and officers of the state. The first is used to distinguish those officers who represent the state at large, governor, secretary of state, etc., as distinguished from district and county officers. The other phrase is employed in the reconstruction acts, to embrace all the constitutional officers, state, district and county officers. The resubmission act of 1869 uses the term state officers as applicable to the governor, secretary, etc., only. If we hold that the admission act applied to these only, then circuit judges are not embraced by it. If we hold, as seems to be the better view, that all officers of the state means all officers provided for by the constitution, which the act ratified, then we find an additional reason to these already offered for the position, that the act relates to the officers of the permanent establishment only. Nine-tenths

of all the officers of the state, and those in the closest rela-
tions to the people, and more immediately in contact with
them, and exercising a great influence by the sixth section of
article 12 of the state constitution, would go out of office
at the end of the thirty days, within which time the officers
were required to take the oath prescribed by congress, and
if circuit judges are held to be included in the sixth section
of article 12, then they would cease to be officers at the end
of eighty days. This renders it manifest that the act of
congress had no reference to the officers of the provisional
government.

Again, that part of the admission act which vacates the
office on the failure to take the oath in thirty days from the
23d of February, 1870, applies to the officers named in the
beginning of the act. There are members of the legislature
who were to take or resume their seats, and all officers of
said state before they enter upon the duties of their offices.
This language points clearly to those who were thereafter
to enter upon their duties, and to members of the legislature
who may be considered as having taken their seats by act-
ing on the constitutional amendments and those who had
yet to take their seats.

The proviso as to vacating the offices uses the term
" every such person," which carries us back to the persons
or officers defined in the beginning. The allowance of the
thirty days was designed for those who might have taken
their " *seats*," and to such officers as might, by oversight or
misconception, have been installed without taking the oath.
The primary object, indeed the whole object, was to purge
the new government of all politically impure elements.

In the case of Moore v. Cooper et al., 43 Miss., that
court materially considered the question whether the func-
tions of the provisional circuit judges ceased on the ratifi-
cation of the state constitution by congress, and decided
that though the constitution had been adopted and ratified,
yet that all its provisions did not go into effect, and indeed
could not, except by supplementary legislation, that, until

the new judiciary should be completely organized so as to fulfill the functions of that important department, the provisional judiciary, from the necessity of the case and from the principle of conservatism manifest in the constitution, must be considered as continuing. The constitution provided for the establishment of districts and the appointment of judges, and the regulation of the proceedings by which the functions of the judiciary were to be performed. It is idle to contend that the appointment of the judges is not a material part of the organization. A court may exist without a judge, but when a new system is to be inaugurated or organized, and with it new methods of appointment of the judges, the system cannot be said to be complete until the judge is constituted. The principle of the decision would continue the relator Leachman in office until the 11th of May, and every reason which is or has been urged for his continuance until the 23d of April, 1870, may be urged for his continuance to the 11th of May.

*Amos Lovering,* on the same side.

The limitation attempted to be applied to the tenure of office, held under military appointment, arises under the act of congress for the admission of Mississippi, approved February 23, 1870. This provides for an oath of office, in these terms, "before any member of the legislature of said state shall take or assume his seat, or any officer of said state shall enter upon the duties of his office he shall take, subscribe and file" such oath "in the office of the secretary of state." The act further provides that "any such person who shall neglect, for the period of thirty days next after the passage of this act, to take, subscribe and file such oath or affirmation, shall be deemed and taken to have vacated his office."

It will be observed that their provisions are prohibitory, to be construed in the light of a penal or prohibitory statute strictly, and the language seemed to indicate no more than is clearly expressed. The prohibition only embraces such

officers as "shall enter" (thereafter being necessarily implied) "upon the duties of his office."

It cannot be extended to officers then in the discharge of such duties, or previously inducted into office, for that would be a plain departure from and violation of the meaning of the terms. "Such persons" "as shall enter upon the duties," etc., only are to "vacate" their offices. There is a plain reason for this language, because the persons then in office had been required by previous laws to take, subscribe and file with the secretary a more stringent oath, known as the test oath, embracing all the features of this oath and much more. The requirement of this oath from them would be a work of supererogation, and cannot be presumed unless plainly expressed.

This oath was evidently intended to apply only to those succeeding to office under the state constitution, then ratified. The previous history of reconstruction plainly shows this interpretation.

This state constitution was then passing in review before congress, and the recital in the preamble, with the first paragraph of the act of prohibition, received the constitution as "republican in form," and admits the state under it, thereby sanctioning its provisions.

It is submitted that the sixth section, twelfth article, under the general provisions in that constitution, provides for the present case in these terms: "Provided, the present incumbents of all county, township, district and beat-offices shall hold their respective offices until their successors are legally appointed or elected and duly qualified."

It is submitted that the word "district" can have no other application than to the judicial districts which were then the only districts as commonly known, to which officers had been appointed, and were acting or incumbents, the present supervisors' districts being called beats. This coupling of the word "district" by the conjunction "and" shows that it means something more than police beats or districts. The officers or members of the legislature had been ex-

pressly designated in the prohibition, and those not state officers were named in the clause now under examination. The prohibition as applied to "any officer of said state shall enter upon the duties of his office," must have been intended to apply to the state officers elected at the time of the adoption of the constitution and well known by the language of the constitution and the concurrent history, to have been elected, and about to assume their duties, on its ratification, with the provision of appointment if a vacancy in the mean time occurred.    The clause in question could have no other meaning than to extend the duration of office to the circuit judges then "incumbents," with other designated officers until their successors could fill them under the provisions of this constitution.    Congress therefore provided, in ratifying this constitution, this express exception or limitation upon their own prohibition, and gave an interpretation in conformity to its terms.

This interpretation is in conformity to the current of judicial opinion concerning the tenure of office.

A review of the decisions applicable, directly or by analogy, to this case, and the exposition of the general doctrines bearing upon it, are aptly presented in the case of Stratton v. Coulton, 28 Cal. 44.    The syllabus following the text presents this proposition : that the salary is incident to the title, not to the occupation or exercise of an office.    The cases referred to are, first, the leading one of Fort v. Purse, 1 Strange, 625, and following it, Queen v. Corp. of Durham, 10 Mod. 146 ; Anonymous, 12 ib. 256 ; McCaw v. Byron Manufacturing Co., 6 Conn. 427 ; Spencer v. Champion, 9 ib. 536 ; Bethany v. Sperry, 10 ib. 200; People v. Runkle, 9 Johns. 148 ; Johns. Ch. Cas. 377.

But the reasoning directly in point, and the principles laid down by this honorable court, in the case of Cooper v. Moore, 43 Miss. 533, seem to settle this question affirmatively for the plaintiff in error.    The necessity to prevent an interregnum of judicial functions seemed fully impressed upon the mind of the court, similar to the doctrine in physics,

"that nature abhors a vacuum," and justly bears its weight in the opinion. Recurring to the position, I have assumed that the sixth section, twelfth article in the constitution, in the use of the words "district," which I submit, as coupled to the conjunction "and," with "beat" officers, could not mean police districts, for that would be tautology, and if such interpretation is admissible, still it would embrace all districts then in existence, including judicial. The opinion favorably presents the query, "If the circuit judge be embraced in the term 'district officers,' then, very surely, by the letter of the constitution, he holds office until displaced by his successor." The doctrines are so fresh in the mind of the court as not to permit a repetition, but I may be excused in quoting a part of the closing paragraph on this branch of the opinion :

"It is plainly inferable that other officers, not enumerated in the sixth section of article 12, were intended to continue in office until some practical provision was made by law for others to discharge their functions. The judges in office, by appointment of the military commandant, would remain in office until the legislature should organize the districts, and a way be opened for the induction of a new judicial system."

Under the guaranty of "a republican form of government," the general government was necessarily compelled to assume the powers of the local or state government to carry forward this guaranty, and the measures necessary to execute it. Congress was necessarily the primary depositary of power for this purpose. The legislation necessary for the purpose was not directed or restricted by the provisions of the constitution of the United States. Congress could invest the military arm or commandant of the district embracing a state with the requisite power and means for the object in view. Under this came the authority from necessity, to appoint the necessary officers to put the machinery of state government into operation.

This was done under the reconstruction laws, and only

ceased in operation as the United States and her officers and appointees passed, by regular course without any hiatus or interregnum, her powers and their powers and functions into the hands of the newly constituted state government and officers. There could be no interregnum without a violation of duty.

The act re-organizing the circuit courts, entitled " An act in relation to circuit courts, approved April 22, 1870," was held by the judge below to have terminated the functions of the circuit judges then in office. The answer claims that the court was abolished. If that proposition be correct, then the officers, as clerks, were thereby abolished, and the fees, emoluments and even copies of records become unauthorized, and should be set aside.

It is submitted that this view of the claim of the petitioner was erroneous, because the circuit courts still existed and the functions still remained. The contemplated severance of the chancery powers of the court, by the organization of a chancery court under the requirements of the constitution, in nowise deprived the circuit courts of their full powers as courts of law, they were still circuit courts *eo nomine* as they had been formerly during the existence of the superior or district courts of chancery. The salary was incident to the title. 28 Cal., *supra*. The change or division of districts did not destroy the functions of the judge. So long as any district remained to him, and until his successor filled his place in such district, his title and functions remained, and he was entitled to his salary. The tenor and purport of reconstruction, the spirit of the constitution, and, it is submitted, the force of the provisions of the sixth section before indicated, all bear to this conclusion to prevent any interregnum, and carry orderly forward the administration of justice. The circuit judge then in office could not absolve himself from his duties without resignation. Suits had been continued and processes made returnable to the next succeeding term of the circuit court as re-organized, and applications for *habeas corpus* and other

proceedings at chambers might intervene in vacation, imperatively requiring the action of the circuit judge before any successor had been qualified to act. No interregnum could be tolerated unless under the express mandate or clear distinct hiatus of the law. The petitioner is also entitled to interest from demand. Were there no functionaries to uphold the court, and was the whole a dead letter until the state executive and his functionaries should infuse new life into it?

*J. S. Morris,* Attorney-General.

This controversy, though in itself embracing only a small amount claimed by only one man, is intended as a precedent to justify the payment of many similar and larger sums, amounting in the aggregate to many thousands, for real or pretended services by the functionaries and agents of the military government established by the reconstruction laws.

The relator in this proceeding having been appointed in 1868, by the commander of the fourth military district which included this state, to be judge of the eighth judicial district, as organized under the state constitution of 1832, has already been fully paid, at the auditor's office, the regular salary allowed to circuit judges by the state laws, from the 21st of November, 1868, the date of his appointment and qualification, to the 23d of March, 1870, the latter date being thirty days after congress accepted and approved the present constitution as being conformable to the reconstruction laws, thus fulfilling, as they declared, the condition upon which the state was to be admitted to representation, and the military reconstruction acts to " become inoperative in such state."

In the absence of any positive provision of law on the subject, this principle for determining the expiration of the official terms of the circuit judges and district attorneys of that extraordinary period, had been adopted by the auditor under advice of the attorney-general, and generally

acquiesced in, at that time, by all concerned, as being just and liberal, to the agents and functionaries of the retiring military establishment. But on the ―――― of ――――, 1871, the relator propounded to the auditor his account against the state for the further sum of $315, insisting that he continued, in theory at least, to be judge of that district, to the extent of its salary at all events, even after the dissolution of the military government of which he was a part; after the passage of the act of the legislature re-districting the state for the present courts; after the appointment and confirmation of the judges for those different districts provided for under the present constitution; and up to the date of the qualification of those last-named judges, some one or more of whom, together with a chancellor or two, it is argued, have become his "successors."

The auditor in the proper exercise, as I shall contend, of his judgment and discretion, under the laws of the state (Rev. Code of 1857, 108, art. 32), declined to pay this demand, and was thereupon, soon after, served with a rule from the circuit judge of Hinds county, to show cause why a peremptory *mandamus* should not be issued against him, compelling him to issue his warrant for the amount of said account. Upon answer filed, the circuit court adjudged that the auditor was right in not issuing his warrant for the amount of the account; but awarded the peremptory *mandamus* against him for a certain other and smaller sum, which the relator had never demanded, and which, for that reason, the auditor had never refused to pay.

From that judgment in the circuit, both parties have prosecuted error to this court; the relator, because he claims $315 and the court below awarded its *mandamus* for only about $198; and the auditor, because he does not believe that the relator, who claims only as a military appointee, is entitled to any salary for time subsequent to the ratification of the present constitution by congress.

In considering the legal and official status of the persons who performed civil functions in this state by authority

derived from military appointment or assignment, regard
must be had to the grounds on which alone the passage of
the reconstruction laws was, and must forever be, justified ;
and to the scope of those laws and their effect upon the civil
and political affairs of the state, as exemplified and illus-
trated by facts which belong to the public history of the
state, and are, therefore, within the judicial cognizance of
this court.

The controlling fact which can alone justify the recon-
struction of the state is recited in the preamble to the first
of this series of laws in these words : " Whereas, no legal
state governments exist in the rebel states." Considering
the exclusive jurisdiction and paramount authority of con-
gress over the subject-matter of this recital, as fixed by the
constitution of the United States and settled by the supreme
court (Luther v. Borden, 7 How. [U. S.] 1), and regarding
the whole subject in the light of the recent revolution, it
were vain, for even those who may feel so disposed, to deny
the absolute verity of this recital. Nay, more. Deny it,
and then the relator in this case is met by the state consti-
tution of 1832, and the laws enacted in pursuance of it, in
which no military appointee to a civil office can possibly be
regarded an officer *de jure*. And yet, if it be admitted, the
inevitable consequence immediately follows that he is
claiming to have been an officer *de jure* under a govern-
ment which had previously ceased to exist.

It is a part of the public history, and, therefore, within the
judicial knowledge of this court, that many of the civil
functionaries of the military government were "officers or
soldiers of the army," who had been "detailed by the com-
mander" for "the performance of civil duties," under the
express authority of the second section of the second Sup-
plementary Reconstruction Act, and that many others were
non-residents of the state, and so remain to this day. From
the first named class, one was detailed and assigned to duty
as governor, another as mayor of Vicksburg, another as
mayor of the capital city. Another filled at the same time

the offices of attorney-general and state treasurer (a judicial and an executive office), in palpable violation of provisions contained in both our constitutions, that of 1832 and that of 1868. These are only a few of the most prominent appointments to civil office under the military government, and all of these were only "detailed" from their commands, and assigned to civil duty, continuing still to draw their pay as officers or soldiers, according to their respective ranks. Of those who were citizens of the state there were comparatively very few who resided in the political divisions or subdivisions of the state in which they were appointed to serve. I submit that this general fact is one of historical import, and therefore judicially known. But if not, the acts of congress referred to clearly authorized the appointment of any person, without reference to residence or other legal eligibility, the words of the act being, some competent officer or soldier "or other person." These words contain both the extent and the limitation of power on the subject of eligibility, and sec. 11 of the second supplementary act requires that all of the acts shall be liberally construed. But this is not all. The government thus established was placed entirely under the "command" of the military authorities of the United States government, and a general officer detailed himself to "protect the rights of person and property." He was to "allow the local governments to try offenders," only when, "in his judgment," it should not "be necessary to organize military commissions or tribunals for that purpose." And from the date of the first of the acts, the local governments were, "if continued, to be continued subject in all respects to the military commanders."

In view of these facts and the provisions of law referred to, it is impossible that the functionaries of the military government should survive that military government itself for one moment. They were mere agents, whose principals were the military commanders, and to whom they were,

"if continued, to be subject in all respects." Sec. 1 of 2d Supp. Act, July 10, 1867.

And, accordingly, to refer again to judicially known and historical facts which have direct bearing on the subject, many of these officers, especially those who had been exercising judicial functions, as soon as the new constitution was fully ratified, abandoned their offices. One learned gentleman, who held both by election of the people and military appointment, decided on the bench that his term of office had, with the adoption of the new constitution, *ipso facto*, expired. Another, who was not a resident of, but only a sojourner in, the district he had served, at once abandoned it and repaired to the capital and applied to the governor elect for the judgeship of another district. Another who was a non-resident of the state, returned to his distant home. Another vacated his place because unable to take either of the oaths required by the "Admission Act." Another held not only all his own courts, but some of the courts in another district, and that without any exchange of circuits. These details may not all be judicially known, but they are known to be entirely within the possibilities of the law, as well as the well-known practice of the military government; and the mention of them here will at least serve to illustrate the class of demands against the state, of which this may, according to this record, be an average specimen, or the one least meritorious of all.

The relator here demands not merely a recognition of his claim for an official salary, but he demands, as we shall presently see, that the auditor who shall consider his case shall deny, to himself and to the state, all benefit of the auditors' accustomed discretion. Nor is this all. The salary thus claimed he pretends to have earned as a circuit judge, according to the constitution of 1832. He admits that he was appointed under a military government, which was based solely on the idea that the entire government which created the office and by which he measures its duties, functions and salary, was illegal. And yet, he pretends to

have earned the amount thus claimed, by services rendered wholly and exclusively after that illegal government, and the military government which succeeded it, had, both alike, ceased to exist.

It is declared by section 5 of the act creating this military government that "when any one of said rebel states" on performing the conditions therein named, "shall be declared entitled to representation in congress;" then all the sections establishing the military and provisional government, "shall become inoperative in such state." And yet, the whole sum here sued for is pretended to have been earned by this relator during a period which commenced more than a month after the state had conformed to the conditions prescribed, and her senators and representatives formally admitted to their seats in congress.

But the counsel for the relator insists that it is necessary to pay this claim, to prevent, what they are pleased to term, "an interregnum." This term signifies an interval of time between the reigns of kings. But by a figure of rhetoric it may apply, in this state, to that interval between the old government under the constitution of 1832, and the adoption and ratification of the new government under the constitution of 1868. Such an interval in the career of a state may well be dreaded as an era of great danger to social order. And it was therefore wise in congress to guard the state through that interval by military force, till the federal government could effectually "guaranty to the state a republican form of government." The state was thus protected, at least to some extent, from the most flagrant evils of an interregnum.

But it is consoling to reflect that the peril is now past, and is not likely to be seriously affected by the payment of, or refusal to pay, the demand here sued for, nor by this court now deciding that this relator presided as the judge of a district sometime after that district was abolished by a constitutional law, and long after the last court held in that district had signed its minutes and adjourned.

Nor can the position of this relator be materially strengthened by his counsel confounding the very common and perfectly harmless occurrence of a mere vacancy in one or more offices, with a governmental interregnum. Such an attempt may display to advantage the skill and ingenuity of learned advocates, but will scarcely mislead any well-balanced mind.

But the most awkward aspect of the relator's claim remains yet to be noticed. This claim is based upon the assumption that the relator is the judge for one of the ten circuit court districts which existed under the circuit court act of 1857; and yet he claims here to have earned a large part of the amount sued for by serving as such judge after all those ten districts had been abolished, and the very same territory created into fifteen new districts under the new constitution. It is true that the act creating the new districts and abolishing the old was "in force from and after its passage." The constitution that created the office was abolished ; the military government that appointed him to fill that office was abolished ; the district over which he was appointed to preside was abolished. But the judge himself was a fadeless flower ! Nothing could abolish him. With a spirit undaunted and a gravity unperturbed, he pursues the salary, though he omits the service. Like a certain domestic bird, of the genus *anser*, he would sit the full period of incubation somewhere in the close vicinity of where his nest was, though the nest itself had long since been broken up, though not an egg remained, and though the spot where it had been was now occupied by a pile of, bricks and cordwood !

The military government of a state under the American constitution being, as all admit, contrary to general principles, and justifiable only by a great and extraordinary emergency, must, of course, be strictly limited to the continuance of that emergency. Of this, congress, and not the courts, federal or state, according to the decision in Luther v. Borden, is the sole and final judge ; and congress having,

by the very act by which the military government was
created, expressly limited, not merely the continuance of
that government, but the operation of the act itself, to the
time when congress should be pleased to acknowledge that
the state had framed and ratified a satisfactory constitution,
and admit her to representation, I submit that all rightful
authority of the military government, and all rightful author-
ity of the officers installed by it, ceased *eo instante*.. Admit,
for the sake of the argument, that up to that time they had
been, which they certainly had not, officers *de jure* under
the constitution of 1832, still they were not aided by even
that admission, because that and " all previous constitu-
tions of the state," together with the ordinance of secession,
were "annulled" in the same section of the present consti-
tution.   See art. 13, § 1.   "Annulled when?"   "Annulled
by this constitution," says this same section.   How, then,
is it possible that this relator could, after that date — the
date of the fulfillment of all that had been sought by either
the friends of the union or of reconstruction — still be an
officer *de jure?*   Admit, if it be insisted, that he continued
to be an officer *de facto* so long as he might linger, theoreti-
cally, in office.   *De facto* officers cannot be recognized even
as such by the courts in suits in which they are plaintiffs.
This is in accordance with all authority, and has but
recently been reiterated by this court in the cases of Kim-
ball, Raymond & Co. v. Alcorn & Fisher ;* Cooper v. Moore
et al., 44 Miss. 386.

And this is a very liberal view of the subject when con-
trasted with the doctrine laid down in the earlier case of
Alcorn v. Shelby, 36 Miss. 273.   By that case he would not
only be incapable of suing in any court, but all his official
acts would have been utterly null and void.

In view of these legal aspects of this demand, it is sub-
mitted that it was the bounden duty of the auditor to refuse
not only the demand of $315, as he did, but also to refuse

---

* *Supra*, p. 151.

him any sum whatever. There was no need to exercise any discretion in so doing, for it is submitted that the law and the facts admitted of no doubt.

But it will be sufficient to maintain my view if it be allowed that the auditor possessed any, even the slightest, judgment or discretion. If among all the persons who were appointed by military commanders to fill salaried offices in this state, and who should present claims for salary alleged to have accrued from any time elapsing after the full ratification and approval of the new constitution, there be one whose claim ought, under either the law or the facts, to be refused in whole or in part, then it follows that the auditor, in adjusting these accounts, has a discretion.

That such directions does exist under the statute requiring him to "examine, state, settle and audit all accounts, claims or demands against the state," and to "require any material information, on oath, from any person or persons, party or privy to any matter relative to any account under examination," is evident from the nature of the duties thus to be performed, and from the manner in which they are to be performed.

Upon the proposition that this judgment and discretion exists in all such cases as this, and that consequently no *mandamus* should have issued, the following authorities I submit as conclusively settling the case: Life & Fire Ins. Co., of New York, v. Wilson, 8 Pet. 701, commencing at bottom of page; Brashier v. Mason, 6 How. (U. S.) 100; U. S. v. Guthrie, 17 ib. 301; U. S. v. Commissioner, etc., 5 Wall. 565.

These cases were decided in the supreme court of the United States; but precisely the same rules apply in the state courts and to state officers in like cases. See Moses on Mandamus, 84, and the cases there cited. And see, also, on page 67 of the same work, the remarks from the opinion of the supreme court of the United States in the case of Decatur v. Paulding, 14 Pet. 514. This, as well as Bra-

shier v. Mason, 6 How. 100, are, in analogy, very similar to
the case before us.

But, to pursue this question still further on its intrinsic
merits, we find the relator entirely cut off from any further
claim against the treasury by his own failure to "take,
subscribe and file" either of the two oaths prescribed by
the admission act for all officers of this state, and the neg-
lect to take, subscribe or file which, for thirty days after
the 23d February, 1870, by any such person, should be,
*ipso facto*, a voluntary vacation of his office. The reason
why all of the class of functionaries to which the relator
had belonged neglected to take this oath is very plain. It
was that they all, at that time, supposed that the terms of
all their official existences had expired with the admission
of the state to representation, and the simultaneous dissolu-
tion of the military government, which, from the words
already quoted from the act of congress, was as essential
to the vitality of their official existence as the soul is to the
vitality of the body. Had the thought ever entered the
minds of those functionaries that they were in any event to
be continued in the places they held under the military
establishment, can any one doubt that at least some of
them would have promptly taken the required oath?

But the claim of one month's more salary was an after-
thought and a mere experiment upon the credulity of the
newly inaugurated government. If this is not true, why is
it that probably not a single court or judicial act was held
or performed by any of these military circuit judges after
the date of the passage of the admission act? But, say
the counsel for plaintiff in error, those oaths were not
intended to apply to the military functionaries. This is
doubtless very true, because it is impossible that congress
should have expected them to again attempt the perform-
ance of any official act. The state had been admitted to
representation, an event which, by the act creating the mili-
tary system of government, was not merely to terminate
the existence of that system, but was also to render the law,

by which alone it was upheld, "inoperative in such state." But what if such an absurdity as the continuance of the remote extremities of military government in power, after its head was gone, could be presumed to have been entertained by congress; even then the words of the act requiring the oath, and fixing the penalty for neglect to take and file it, are too plain and comprehensive to admit of aid in construction by reference to extraneous and cotemporary facts. And although these military functionaries had taken, readily enough, the oaths previously required, they had not taken the oath prescribed by the admission act. That oath was based specifically on the fourteenth amendment, which had only recently become part of the constitution. An oath to support the constitution, as it had been, was not regarded as an oath to support it in the shape it assumed after the addition to it of this amendment. Besides, the military surveillance of the district commander over these officers, and his power of "removal of them for disloyalty" as conferred by section 5 of the second supplementary act, was now about to depart. In an age of oaths, this was an epoch in the history of the state and of the rebellion singularly appropriate for the invention of a new one, such an one as should not only cover the amendment then recently adopted, but one which, in its strength and efficacy, should be equivalent, if possible, to the presence of a military commander with all the machinery of his system of government. My firm belief is that this oath was intended to apply, not specially to any class of officers, but to all persons who should henceforth attempt the administration of civil affairs in any department of this state government. If, by any legislation which had been or might be adopted, or by any construction which might be given to the constitution, the military appointees should, after the withdrawal of their paramount head, continue to hold power or authority, well; and if not, well. This was a matter about which congress might well afford to be indifferent. But not so as to the observ-

ance of the subject-matter of the fourteenth amendment. Upon this question, and the future loyalty of the government of the state, they were concerned. And it was for this reason that all its legislative, executive and judicial functions were required to be performed under the obligations of one or the other of the oaths prescribed in the act of admission.

Upon the assignment of errors by the auditor on his cross-writ of error it is confidently submitted, that, even if this honorable court should be of opinion that the relator is for any reason entitled to the amount awarded to him by the court below, the judgment for a peremptory *mandamus* against the auditor was undoubtedly wrong, because that is not the sum for which, according to the record, he was asked, or for which he had refused to issue his warrant. But the petition shows that he was asked, and that he refused to issue his warrant for the sum of $315. The judgment of the circuit court awarding *mandamus* for a smaller amount is, in effect, an adjudication that the auditor was, in no respect, in default, and that, had he issued his warrant for the larger amount, it would have been a misfeasance in office, or at least an error.

The learned judge in the court below had doubtless in his mind the law and practice in actions of *assumpsit* and inadvertently applied them to this suit. This is certainly an error. To hold otherwise would be to hold that any claimant against the state, to whom is due a specific amount, may sue out against the auditor a peremptory *mandamus* unless the auditor shall, in the first place, pay him double the amount to which he is entitled.

SIMRALL, J. :

Robert Leachman instituted suit by *mandamus* against the auditor of public accounts, having for its object the issuance of a warrant on the treasurer, for a balance claimed to be due him as judge of the eighth judicial district.

The relator states in his petition, that, on the —— day

of ———, A. D. 1868, he was appointed judge of the circuit court for the eighth district, by the commandant of the fourth military district, and that he continued to discharge its duties, until the 11th day of May, 1870, when, by the reorganization of the districts, the counties included in the eighth district were assigned to other districts. That his salary has been paid up to the 25th of March, but from that time to the 11th May, 1870, there is due him the sum of $321 45, for which the auditor refused to issue his warrant.

The auditor, in his response, states that the relator "had declined or neglected to take the oath prescribed by the act of congress of 23d February, 1870, for the admission of the state to representation in congress." And further, that by an act of the legislature of 20th April, 1870, in relation to circuit courts, the said eighth district was abolished; and with it the office of judge of that district.

The circuit court awarded a peremptory *mandamus* for so much of the salary claimed as accrued between the 25th March and 22d of April inclusive. From which judgment both parties have prosecuted a writ of error.

The right of the relator to recover salary depends upon the solution of the question, when his title to the office terminated.

The act declaratory that the state has conformed to the requirements of congress, by the adoption of a constitution acceptable to that body, and that senators and representatives should be admitted to their seats, was passed on the 23d of February, 1870.

The fifth section of the first of the series of the reconstruction laws, passed 2d March, 1867, among other things, declared in effect, that when the state shall have complied with the conditions, and declared entitled to representation in congress, then the military government shall cease and become inoperative. The state government then in existence was declared to be illegal, so declared, doubtless, because the law-making department maintained that it per-

tained to congress and not to the executive to prescribe the conditions upon which there should be a restoration of the state to federal relations. "The powers exercised by the president was supposed, doubtless, to be derived from his functions as commander-in-chief; so long as the war continued he might institute temporary government within insurgent districts, which would be considered provisional." Texas v. White, 7 Wall. The right to legislate in the premises was claimed to be derived from that clause of the constitution guaranteeing to each state a republican form of government. Not simply in the sense of institutions founded upon popular sovereignty, and a government administered by agents or representatives chosen by the people; but, in addition to this, a state in full and inseparable association with the other states in the union under the constitution, so that there may be a perpetual union of indestructible states; the national government guarantees a perpetual preservation of the state in the union, whether as against domestic insurrection or foreign power.

If, therefore, either by domestic or foreign war, the federal relations of the state should be for a time interrupted and broken up, the national government is under obligation to do whatever may be necessary and proper to restore the state and her people to their normal place in the union.

While congress declared the state government brought into existence in 1865, under the proclamation of the executive, to be illegal, it did not undertake to abolish it; but continued it, provisionally subject, as announced in the law, to the paramount authority of congress, and subject also to the military authority. The scope of these laws clearly indicates the purpose to continue the machinery and functionaries of the state government as an instrumentality, by which the civil rights, both of persons and property, should be conserved and protected. Mainly, was the judiciary to be looked to to administer both civil and criminal justice. The courts were to be kept open as aforetime, to judge the people according to the law of the land; and that

their judgments and decrees may be executed, there must be the appropriate body of executive and ministerial officers.

The re-construction laws meant to deal with the political relations, more especially, of the people and the state; their policy was a re-construction of the institutions and fundamental law, upon a basis adapted to the new conditions of society, wrought by the war.

But society in its civil and domestic relations was to be as little disturbed as possible. Business, occupations, trade and commerce were to go on; transfers of property were to be made in the mode and according to the formula of law. Necessarily there would be marriages, births, deaths, testacies and intestacies, creditors and debtors. Congress designed that these great interests and relations, which constitute the cohesive and constituent elements of organized society, should be left under the protection and regulation of the laws already in force. Therefore the state government, with its magistracy, in all the departments of administration was to remain provisionally subject to the authority of the military commandant to remove and appoint its officers at pleasure. This state government would retire contemporaneously with the withdrawal of the military authority, and that time would arrive so soon as the new government was inaugurated. It is absolutely necessary, when one government succeeds another, that there should be no vacuum, no interregnum, otherwise, for a time, there might be an absence of authority, resolving society into a condition of chaos and anarchy.

The military government and the provisional state government, as an adjunct to it, expired on the 23d of February, 1870. It would follow that the title of every appointee of the military commandant to office would on that day expire, unless competent authority had made provision for their continuance until the complete installment of the new government. But there is a principle of the common law, having its foundation in the fitness of things, resting upon the necessity of some authority, especially in times of dis-

order, confusion and sudden political change, to which reference may be made to hold society to its organization, and to which the rights of men, absolute, relative, and of property may be subordinated, which principle recognizes the incumbents of the retiring government as so far rightfully in place as to validate their official acts, until the incoming government declare otherwise. The officials of the old government will be regarded as holding over at the sufferance of the new. Without title to the office, they shall nevertheless be respected and obeyed, and their acts are received as *de facto* incumbents. Kimball, Raymond & Co. v. Alcorn, Fisher,* and Cooper v. Moore,† are recent instances of the assertion of the principle in this court. Although the title to the office of circuit judge may have terminated on the day of the passage of the "admission act" by congress, yet all things done by them afterward (if otherwise rightfully done) are valid as official acts, so long as the incoming government suffered them to be incumbents of office. In the case of the contested mayoralty, reported in 19 Grattan, 672, arising out of the transition of Virginia from the military to the civil government, it is said "that the incumbents of office, at the time of an organic change of government continuing to hold over after such change (in the absence of a provision in the new constitution, or an act of the legislature of the new government) hold by sufferance only, and on a principle of public necessity or convenience." It was ruled by Chief Justice Chase, on the circuit in Woodson v. Fleck, 9 Am. L. Reg. N. S. 439, that the municipal authorities of Harrisonburg, elected under the insurgent government of Virginia, after the town had been captured by the United States forces, and was in their possession, "continued in being *de facto*, charged with the duty of maintaining order until suspended by the regular government." The same principle was enforced by the supreme court of the United States in Cross v. Harrison, 16

---

* *Supra*, p. 151.                              † 44 Miss. 386.

How. 164.   A military government had been established in California during the war with Mexico ; speaking of it, the court say : " The termination of the war left an existing government *de facto.* .This will continue with the presumed consent of congress until it shall provide for them a territorial government.   *   *   *   The great law of necessity justifies the conclusion."

In Griffin v. Cunningham, and Washington, Georgetown and Alexandria R. R. Co. v. Washington and Alexandria R. R. Co., 20 Gratt. 31, it was held that the judgments rendered by the court of appeals of Virginia, under military appointment, after their right to office had expired, and after the military government had been withdrawn, were valid, on the ground that from the necessity they were *de facto* incumbents.

It is never to be supposed, when one government is retiring, and another taking its place, that there shall be an interval of time, when there will be no magistracy to discharge the functions of administration.   To displace all officers, and withdraw all authority, would uproot the foundations of society, and entail upon it untold evils.   The mind cannot compass the manifold mischiefs, present and prospective, which would ensue if the theory should prevail, that between the 23d of February, 1870, when the military government was superseded, and the several periods when the magistracy, under the new state governments, were installed in their places, there were no officers in many of the most important departments ; there would be no judge to deliver from false imprisonment, or to order a provisional and remedial writ ; no justice of the peace to issue a warrant ; no sheriff to arrest a felon ; no jailor to receive him ; no magistrate to take the acknowledgment of deeds or record them ; no clerk to keep the public records, to issue a marriage license ; no person to celebrate the marriage rite.   Indeed, the ligaments which hold society together would for a time be broken, and life, liberty and property would not be under the protection and guaranty of law.

It has been usual, therefore, when a charge is made in the organic law, to provide for officials then in place to continue in office, until their successors were brought in. This was attempted to be done in the sixth section of art. 12 of the constitution. The language, however, is not broad enough to include all the officers of the state. Nor was this necessary. The governor, auditor, treasurer, attorney-general, and secretary of state, were elected at the same time the constitution was ratified by the people, and were ready to enter upon their several functions, and did do so, the very moment the military government was withdrawn. The sixth section provides that the incumbents of all county, township, "district" and beat offices, shall hold their respective offices until their survivors are "legally appointed or elected," and duly qualified. The proviso to the section is broader than the enumeration in the body of it. Those mentioned in the body hold until provision is made by the legislature for their election.

The proviso embraces "district" offices in addition to those previously named. The incumbents hold until successors are legally appointed or elected. The district attorney is included in the proviso, he takes office by election. There are no others, who could be said to hold by appointment, except the circuit court judges. The thirteenth section of the constitution of 1832, art. 4, declares that the circuit judges shall be elected by the qualified electors of each judicial "district." The thirteenth article directs the state to be divided into convenient "districts." This sixth article of the present constitution describes the offices therein referred to, "territorially" as "county," "beat," "district," etc. It is obvious that the sheriff, clerks of the court, and probate judge come under the description of county officers; would it do any violence to the language that circuit judges may as well be embraced in the term "district" office, as the prosecuting attorney for the state. In the supervisor's case decided at last term it was said, that the district attorney was of that class of officers. The obvious intention of the

sixth section of the twelfth article was to enable the incumbents of state offices under the military rule, whose places were not filled by popular election, and whose services were absolutely necessary to the orderly administration of authority, to hold over, in order to avoid the evils of an interregnum. This manifest purpose should be steadily kept in view, and that interpretation placed upon its language, if possible, which will accomplish the result. In 1 Story's Com. 383, a principle of construction is stated, eminently wise and proper. " The primary object of a constitution is harmonious order in the operations of the several departments of the government, and where the instrument is doubtful or not sufficiently specific in its provisions, we may safely conclude that it was not the intention of the framers to produce disorder and confusion." Again, the commentator says : " If the design and object be clear, although the provisions be doubtful, we have a sure guide to a proper construction." In 9 Wheat. 1, the court lays down the rule "that where the constitution is not entirely explicit in itself, and requires construction, it ought not to be so construed as to cripple the government and render it unequal to the objects for which it was instituted." See, also, Cooper v. Moore, 44 Miss. If, therefore, it was doubtful whether a circuit judge was included in the term " district" officer, as used in the sixth section, I should feel altogether warranted, in accordance with these canons of interpretation, in order to give effect to the object aimed at, to hold that he was.

The chief justice is of opinion, that the circuit judges are not embraced in the sixth section of the twelfth article of the constitution ; but that provision is made for holding over by art. 183, p. 136, Code of 1857, which declares that the term of all officers not otherwise provided for by law shall be limited to four years, " and until the successor therein shall be duly qualified." Aided by section second of schedule, which continues in force all laws not repugnant to the constitution, except certain specified acts, etc.,   *   *   *

so that the constitution kept in force the act quoted. As to the result reached, it matters not whether the circuit judges hold over, under the sixth section of the constitution, or under the law of 1857.

On the 22d April, 1870, the legislature passed a law apportioning the counties into fifteen districts, which took effect from and after its passage. The relator was appointed judge of the eighth district, as organized by the Rev. Code of 1857. Not a single county embraced in that district is included in the eighth district under the statute of 1870, but all these are assigned to either the first or second districts. The fourth section of this act transfers all pending and undecided causes to the circuit courts of the several counties as created by the act. The effect of this law was to abolish the district of which the relator was judge. Circuit courts could no longer be held in the counties, as prescribed by the Code of 1857. The relator in fact ceased to be judge of the circuit court of the eighth district.

There can be no such office as that of circuit judge without a district. Circuit courts as arranged and provided for in the ten districts by the law of 1857, were repealed by the law of 1870, creating fifteen districts, arranging them into territory and appointing different times for holding the courts. The military commandant assigned the relator to the district as established in 1857, when that district was repealed and its territory divided between districts one and two. It could not be properly said that the relator was circuit judge for the eighth district.

The claim to salary is preferred under the state law. The statute proposes to compensate the judge for services rendered in holding the terms of his court in the several counties of his district. His duties at chambers are few, and are incident to his office. When, therefore, the new government took from him his district, and made it impossible for him to discharge the important functions of circuit judge, his right to the salary ceased also. It was such legislation as dispensed with his services as circuit judge,

and from that time his right to salary terminated.   If, after that, he acted officially at chambers, while the thing done (if otherwise legal) would be valid, his claim for compensation would depend on the pleasure of the legislature.

We do not think that it was incumbent on military appointees to take the oath prescribed by the second section of the act of congress, 23d February, 1870.   The terms of the act evidently make it applicable "to members of the legislature before taking or assuming their seats, or before the officers of said state shall enter upon the duties of his office;" limiting it to those functionaries assuming office under the constitution recently adopted.

The provision does not apply to officers of military appointment who might hold over under the sufferance and permission of the incoming government.   Nor was there reason that it should.   Military appointees were required to take the oath of office prescribed by the act of 1862, which was more stringent than this, and which many persons, accepting office under the constitution, could not take.

We affirm the decree.

TARBELL, J., being interested in the question, takes no part in the decision.