THE STATE *v.* JAMES WILLIAMS, County Treasurer.

1. CONSTITUTION OF MISSISSIPPI—WHEN IT WENT INTO OPERATION.—The ratification of the constitution, by the popular vote, on the 1st of December, 1869, was the efficient act which adopted the instrument as the organic law. It did not become functionally operative in all its parts until the State government was completely organized.

2. SAME—REPUBLICAN IN FORM.—The reconstruction acts made the adoption of a constitution republican in form, and the ratification of the fourteenth and fifteenth amendments to the Federal constitution conditions precedent to representation in Congress. But the enjoyment of the right was postponed until Congress had ascertained that the conditions had been performed, and so declared.

3. SAME—POLITICAL YEAR.—The sixth section of the fourth article of the constitution appoints the first Monday in January as the beginning of the political year, which is the beginning of the term of elective officers, State and county.

4. SAME—TERM OF OFFICE.—The terms begin on the first Monday in January, although the offices may not be taken possession of until after that day.

5. Same—Biennial Elections.—The seventh section of article four requires elections to be biennially, by ballot, on the first Tuesday after the first Monday in November, until altered by law.

6. Same—Act of May 13, 1871.—The election held under the act of 13th May, 1871, on the first Tuesday after the first Monday of November of that year, was a biennial election, as contemplated by the seventh section of the fourth article of the constitution. The relator at that election was elected county treasurer for the constitutional term. Such was the character of the election held the first Tuesday in November, 1873, at which the defendant was chosen county treasurer, which conferred upon him a right to the office for the term of two years, and until his successor was qualified.

7. Same—General Election—Refers to State and County Elections.—The biennial general election has exclusive reference to State and county officers. The fact that the election of members of Congress does not take place at the biennial election for State and county officers, does not affect the question.

8. Same—Congressional Elections.—By the fourth section of article 1 of the Federal constitution, paramount authority over congressional elections resides in Congress.. But until Congress exerts its power, "the times, places and manner of holding elections for Senators and Representatives shall be prescribed in each State by the legislature thereof."

Note.—Both of the Justices who delivered opinions, concur in the foregoing propositions. Reference is made to the respective opinions for interesting discussion of them and collateral topics.

Error to the circuit court of Hinds county. Hon. Geo. F. Brown, Judge.

This was an information of *quo warranto*, against Williams, who demurred, and the demurrer was sustained, and the suit dismissed.

As required by the Code, the information was so framed as to present, not only the claim of the State against Williams, as an alleged usurper of the office of county treasurer of Hinds county, but also the claim of John M. Chilton, the old incumbent of the office.

Chilton was elected in November, 1871, and claims, as does the State, that the alleged election of November, 1873, was void, because the election law of 1871, in so far as it provided for a general election in November, 1873, was unconstitutional and void.

Chilton claims that his constitutional term of office continues until January, 1875.

Williams was, *in form*, elected in November, 1873, and in form, qualified; and took possession of the office, just after

the commencement of the present political year. The de-
murrer restricts this controversy to the two questions : 1.
The constitutional validity of the election in November, 1873.
2. The times of the commencement, and the. end, of regular
constitutional terms of elective offices.

The following was assigned for error :

1. The court below erred in sustaining the demurrer of
the said James Williams, to the said information herein, and
in rendering judgment for said Williams, and in dismissing
said information at the costs of the relator, the said John M.
Chilton.

2. Said demurrer should have been overruled, and judg-
ment rendered against said Williams.

*A. H. Handy,* for plaintiff in error :

The power of the United States government in Mississippi
ceased with the approval by Congress of the present consti-
tution, and the admission of the State into the Union ; which
took place on the 23d of April; and thenceforth our State
government acquired its complete status as a regular consti-
tutional government, under our present constitution. Leach-
man v. Musgrove, 45 Miss., 536.

But the State officers and legislature elected on the 30th
of November, 1869, when the people ratified the constitu-
tion, continued to hold from that time until the admis-
sion of the State by Congress, and for the residue of the
year 1870, in order that proper steps might be taken by
those officers to organize the government completely in all
its departments, in State and county affairs, by the time of
the commencement of the *first political year thereafter,* and
in order to prevent an interregnum. Same case, 530, 539.

The admission took place after the beginning of the year
1870, and therefore, the first " political year " could not com-
mence with that year. but must take place on the com-
mencement of the succeeding one, to-wit, 1871.

It was manifestly the intention of the framers of the con-
stitution, that the new government, thereby created, should

be put into complete operation, under the constitution, at the earliest practical period—that is, at the commencement of the first " political year " after the State should be admitted into the Union—in order that the abnormal condition of dependence on Federal authority should be put an end to, as speedily as practicable. And the first practical period for the commencemout of that era, was the 1st of January,. 1871.

lt is therefore, manifest that, that year, under the circumstances of the admission, and by the terms of the constitution, must be taken as that contemplated by the framers of that instrument, as the first political year. And if the proper steps to complete all the details of operation of the new government then inaugurated, were omitted to be taken from February, 1870, to 1st of January, 1871, by the State authorities then in power, it was simply an omission of duty, which did not affect the organism of the government, nor make the year 1871 less the first political year of the new government, nor take away its character, as the era from which future elections were to be calculated, with reference to the quadrennial and biennial elections ordained by the constitution to be held.

That year was unquestionably the first " political year " under the constitution, though officers then administering the government, had been elected before the constitution took effect practically; for the Federal authority had passed away by the admission in February, 1870, and the State was under the government of functionaries elected by the people of the State, in virtue of the re-submission act of 1869. Leachman v. Musgrove, *supra*. But these officers had ceased to be officers under the authority of the United States, and were actually officers of the State of Mississippi, and they actually continued and acted as such on the 1st of January, under the *necessary* operation of the present constitution, under the circumstances then existing.

The first political year had commenced in January, 1871, and the year 1872, was the second. Allowing the

officers their appropriate terms, under the constitution, those required to be elected every two years, should have been elected in November, 1872, and those to be elected every four years, should be elected in 1874.

The constitution provides that members of the house of representatives " shall be chosen *every second year*," and that senators " shall be chosen every four years." But from what time are those periods to be computed? Clearly from the first " political year," which, as above shown, must be the first year in which the government was in operation under the constitution, that is, when it was in operation on the first day of January, which was the year 1871.

This commencement of the first " political year " did not depend *on the subsequent action of the legislature*, but was determined by the terms of *the constitution*, which fixed it with reasonable certainty, to be, when the constitution and the government went into operation on the first day of January, next, after the State was admitted into the Union. If this be not true, then the mere failure of the State functionaries to fix a time, by positive legislative act, when the constitution and government should go into operation, might postpone the regular institution of the government to an indefinite time, during all of which they would continue in office, and the first political year did not commence until the 1st of January, 1872, by force of the act of 1871—thus, *ignoring the constitution as putting the government in operation, of its own force.*

Our constitution, like the constitution of the United States, went into operation as *a necessity* from the *circumstances of the two cases*, not from any time specifically fixed, but *from facts afterwards to occur*—that is, whenever the government went into actual operation as the government of a sovereign State, like the other States of the Union—ours, on the first of January after the admission of the State into the Union, which is the first year of the political existence of the State, under the constitution, and the Federal consti-

tution, on the 4th of March, when the President was inaugurated.

If these views be correct, it follows that the first " political year," under the constitution, was the first occuring after the State was admitted into the Union, which was that commencing on the 1st of January, 1871; and that the election in 1871 was in violation of the rule established by the constitution, and that, that election, and that in 1873, was void.

*Geo. L. Potter,* on same side :

It is alleged for the defendant, that the late November election was a regular general State election. Its validity depends on the time when the State constitution took effect as the fundamental law—the time when Mississippi became as free from congressional control as any State of the Union. It is not enough for defendant to show that, before that time, elections were held and some sort of provisional government existed under it, during the process of congressional military reconstruction. We seek for the initial date of *a State government* under a State constitution, such as is known in our American system of government. After that date is fixed, the next inquiry will be, when did the terms of office commence under that constitution? The solution of the first question depends, mainly, on the construction of the reconstruction acts of Congress.

By those acts, the then existing constitutions and governments, in the southern States, were denounced as *illegal,* and those States as " rebel States," unlike the other States, and subject to the control of Congress. They were placed under military government, and the power of the sword was to be continued " until loyal and republican State governments can be *legally* established." As expressly declared, Congress thus assumed to subject those States to " the paramount authority of the United States," and to govern them, and to control the formation of their permanent constitutions and governments. It declared that " all the provisions " of those acts " shall be construed *liberally,* to the

end that *all the intents* thereof may be fully and perfectly carried out." Assuming its facts, Congress seems to have adopted the military remedy suggested in 5 How., 377–8.

Mr. Potter here cited the provisions of those acts showing the comprehensive and absolute power vested in the military commanders. They might " organize military commissions or tribunals " to try all offenders. They might " suspend or remove from office " any and every civil officer, and *detail* " some officer or soldier of the army," or appoint " some other person" to perform the duties of the office. During the whole time of the military supremacy, the civil governments, " if continued, were to be continued, subject, in all respects, to the military commanders, and to the paramount authority of Congress." This power of control was expressly extended to any civil governments that might be established at any time during this domination of the sword, " until the people of said rebel States shall be, by law, admitted to representation in Congress; any civil governments which may exist therein shall be deemed provisional only, and in all respects subject to the paramount authority of the United States, at any time, to abolish, modify, control, or supersede the same."

The Congress ignored those States as constitutional States of the Union, and assumed to control and deal with them as " Rebel States," and " so-called States." Their position as States of the American Union was denied; and this seems to have been regarded as a necessary result of the rupture of their Federal relations. Such seems, also, to have been the views of this court, as expressed in 46 Miss., 215. Acting on this assumption, Congress, by these acts, expressly declared, that this abnormal state of military subjection should continue, " until the people of said rebel States shall be, by law, *admitted to representation in Congress.*"

Certain things were prescribed, by Congress, to be done as conditions precedent to the right of representation. A constitution of government, with certain prescribed provisions, was to be formed and ratified; that instrument was to be submitted to Congress for examination, and for its rejec-

tion or approval. A legislature, to be elected, was to approve the 14th amendment.

It was not until after such constitution had been thus approved, and the amendment ratified, nor until that amendment should have "become a part of the constitution of the United States," that the subjected State was to "be declared entitled to representation in Congress, and senators and representatives admitted therefrom."

Thus, the acts of Congress defined the character of the congressional military rule, and fixed the period of its duration. In December, 1869, an election was held, the constitution was ratified, and State officers and a legislature were elected. It is now urged for the defendant, that these officials then took and held office under the established, permanent government of Mississippi as a State of the Union. That legislature ratified the amendment, and it is urged that this was *a State act.*

These acts of Congress look to the possibility that, during the process of reconstruction, and military rule, " civil governments" might be established, and elections held to " elect officers under such provisional governments," etc.; but they expressly declare that all such governments " shall be deemed *provisional* only, and in all respects subject to the paramount authority of the United States, at any time, to abolish, modify, control, or supersede the same." By like provision, all such governments, "if continued, were to be continued subject, in all respects, to the military commanders;" and those commanders might, at will, and at any time during reconstruction, "suspend or remove from office" any civil officer, and might " detail some officer or soldier of the army," or " appoint" some other person, " to discharge the duties of the office." This military subjection, to control, supersede, or abolish, was to continue until the State should be declared entitled to representation in Congress; and until that date, the abject condition of Mississippi, as by assumption of Congress, a "rebel State," only a "so-called State," was to be continued. Viewed by the light of these reconstruction

acts, how absurd is the pretense that this ratified constitution, not yet approved by Congress, or those State officials, and that legislature liable to suspension or removal by the military commander, and those offices that might be filled by "detail" of "some officer or soldier of the army," then constituted part of the permanent constitutional government of Mississippi as a constitutional American State.

By the fifth section of the first supplement, Congress was to examine and decide whether the election of ratification was free and fair; whether the constitution met "the approval of a majority of all the qualified voters in the State;" whether it conformed to the policy of reconstruction, and whether the other exactions of Congress had been complied with. Congress might set aside the election, and reject the constitution. Until Congress should give its sanction and declare Mississippi "entitled to representation," the subjected State would remain a "rebel State"—only a "State *so-called*." It seems impossible to hold that this sort of congressional nondescript could establish and put into operation an American State constitution and government, or participate in amending the Federal constitution.

But there are other conclusive reasons why the constitution did not take effect as the permanent constitution of the State until Congress declared Mississippi entitled, on the 23d February, 1870.

1. Congress had expressly declared that, until that time, "*any* civil government which may exist therein shall be deemed *provisional only*," and wholly subject to its will; and also, "subject, in all respects, to the military commanders."

2. This court has decided that the military domination continued; that the State government was only provisional until that date. "The military government, and the *provisional* State government, *as an adjunct to it*, expired on the 23d of February, 1870." Leachman v. Musgrove, 45 Miss., 536.

3. A State government could not exist during this mili-

tary domination; " all interference, under color of State authority, with the exercise of military authority," was declared to be " void." The two jurisdictions, the congressional military, and the State civil, as *governing* within the same limits, were utterly repugnant, and could not co-exist. This view was maintained by McLean and Nelson, justices, in a case where a majority of the court, holding there was no jurisdiction, expressed no opinion on the merits. 5 How. (U. S.), 381, 386.

" Before a State government, clothed with legislative power, could come into existence, the territorial government (representing the power of Congress) must cease to exist." 20 Ohio, 295.

For a like reason, it was held that the Federal constitution, duly ratified before November 1788, did not take effect until March 1789. It was held that the government of the Confederation existed, although in name only, until that date; and therefore, said the court: " *Both governments could not be understood to exist at the same time.* The new government did not commence until the old government expired. It is apparent that the government did not commence on the constitution being ratified by the ninth State; for these ratifications were to be *reported to Congress.*" Just as, in our case, the constitution and the ratification were to be transmitted to, examined, and approved, by Congress. For that reason it was held that the Federal constitution was not the fundamental law until March, 1789. Owings v. Speed, 5 Wheat, 420; Const. U. S., Art. 7.

4. Neither Congress nor the constitutional convention contemplated the absurdity of establishing a permanent State government, to begin during the time of military subjugation. Such an act of folly would have defeated the policy of reconstruction.

The continuance of paramount military government over the State " until " Congress should declare Mississippi entitled to representation, was a conclusive bar to the legal operation of the constitution, as the fundamental law, from the

1st Dec., 1869, the date of the popular vote of ratification. The fact that this constitution was to be first reported to and approved by Congress, is also a full reason why it could not operate as the fundamental law from the date of popular ratification.

The likeness between the case of Owings v. Speed, 5 Wheat, and the present case is striking. In that case, the ratification of the Federal constitution was to be "reported to" the continental congress. Our constitution was to be "submitted to Congress for examination and *approval*." Original Act, § 5. By the first supplement (§ 5), it must be "transmitted" to Congress that it might examine and decide upon the validity of the election, &c., and approve or reject the constitution.

In the Federal case, the old Congress was to fix a day for election of President and Vice-President, "and the time and place for commencing proceedings under this constitution."

In the Mississippi case, paramount military rule was to continue, and was continued, "until the people of said rebel State shall be *by law* admitted to representation in the Congress of the United States." Orig. Act, § 6. It was thus that Congress fixed a time, before which it was *impossible* to attempt, "commencing proceedings under *this* constitution," as the organic law of a State of the Union. Thus, the decision in Owings v. Speed, exactly covers and settles our case. See, also, remarks of McLean, J., 5 How. U. S., 381, 386; 20 Ohio, 295, 208–9.

Now, it is manifest that the *permanent* State government could not exist, under the constitution, until after that instrument had become operative as the organic law. Until that time, all civil authority exercised in the State, must be *"provisional* only," and so this court held, in Leachman v. Musgrove.

Congress did indeed, by the 3d supplement, authorize the election of members of Congress, and "all elective officers;" which election was to be held at the time of the vote for

ratification. But that election was provisional only. The persons elected could not enter upon their constitutional terms until Congress should act and give operation to the constitution.

So, the constitutional convention provided for the election of members of Congress, " to fill the existing vacancies, and for the full term, next succeeding their election." Const., art. 12, § 25. It also provided for elections to fill offices provided for by the constitution, and declared that their "first term" should commence on the second Monday after their election was officially proclaimed ; and they were to " continue to hold from said time until the expiration of the *first full term* succeeding their election." Ib., art. 13, schedule, § 9. Thus a *provisional* civil government, subject to the military supremacy, was provided for, such as the reconstruction acts seemed to sanction. The officers elect were to enjoy a "first term," and then a " first full term," and evidently this last was to be a regular *constitutional* term, to commence after that instrument should operate as the fundamental law.

By sec. 8, of that schedule, a legislature was to be elected at the same time, and it was first to ratify the 14th amendment, as prescribed by Congress. It was not left to the free judgment of Mississippi, *as a State*, to approve or reject that amendment, but the Congress *required* its adoption *as a test of submission*, deemed essential to the work of reconstruction. It may be assumed that Congress thus attempted to *coerce* a State to vote for a proposed amendment of the fundamental law.

The re-submission act did not change the essential features of the reconstruction policy, but it required the legislature, also, to adopt the 15th amendment, as essential to the admission of the State to representation. It expressly declared that the action of the people of the State should " *not be final,* or operative, as a complete restoration thereof, until their action shall be *approved by Congress.*"

If the people had dared to act as free people of the Union, and to reject these amendments, what then ?

Even the admission act declared the continued supremacy of Congress over the State, and clogged the act of grace with provisons and conditions. No member of the legislature might " take or assume his seat," and " no officer of said State " might *enter upon* the duties of his office " until he took a prescribed *test-oath;* and if he failed so to do for thirty days, *the Congress* was pleased to declare that such person " shall be deemed and taken, to all intents and purposes, to have vacated his office." What sort of American State could that be, to whose legislature and State officers Congress thus assumed to dictate?

It cannot be held that, by relation back, or by legal fiction, the constitution took effect, as fundamental law, in December, 1869, and for these reasons:

1. It would be contrary to the will of Congress, as declared in the reconstruction acts.

2. It was legally *impossible* to be so, for Congress declared that Mississippi was not then a political State, in any Federal sense, and Mississippi was then subject to congressional military control.

3. The reasons given in Owings v. Speed, are conclusive against such a pretense.

4. The law will never make any fiction (relation) but for *necessity*, and in avoidance of a mischief." Baker's Case, Coke Rep., pt. III, vol. 2, p. 30.

5. Such relation is allowed only to give equity, and never when it will work a wrong. If allowed in this case, it would deprive the officers elected in 1869 of their constitutional " full terms."

A signal illustration of the then existing state of things— the hard matters of *fact*—was the act of Gen. Ames, who, in 1870, as military governor, certified his own election to the Senate of the United States.

The constitution provides for biennial elections, and for two and four years' terms for elective offices. It fixes the beginnings of the terms of office to commence with the political year. In December, 1869, representatives of both

the two years terms and of the four years terms, were elected, and all their terms would *begin* with the commencement of the first political year occurring next after the constitution took effect as the fundamental law of the State, which was in January, 1871; and thus the commencements of the constitutional terms of elective offices became fixed, and the legislature could not alter them; hence the so-called general election law of 1871 is repugnant to the constitution, and is void.

Mr. Potter presented an elaborate argument in answer to objections urged against this view of the case.

*W. L. Nuyent*, for defendant in error:

The constitutionality of the general election law of this State is the question presented for the consideration of the court. The constitution requires *general elections* to be held every two years, on the first Tuesday after the first Monday in November, and the law now called in question provides for holding the *first* general election on the first Tuesday after the first Monday in November, 1871, and biennially thereafter, as required by the constitution of the State. There is, therefore, no *patent* conflict between the act of the legislature and the constitution; and unless some *latent* incongruity can be discovered, the law ought to be maintained   It is urged that, by the laws of the State, the election for members of Congress and electors for the President are to be held in 1872, and biennially thereafter, and, if the general elections for State officers are held in 1871, and biennially thereafter, the effect will be to have general elections *annually*, instead of *biennially*, as expressly required by the constitution. This argument is without any real force, however plausible it may appear, if we consider that elections for members of Congress and Presidential electors are fixed by Congress, and held not under the constitution of this State at all. Besides, the phrase "all general elections," as used in our constitution, refers to the election of *State* officers alone, and a careful consideration

of the phrase will relieve it of all obscurity. It is also in-
sisted that, as our present State officers were inaugurated on
the 10th of March, 1870, under the constitution, their term
of office is to be held as commencing on that day. The con-
stitution was ratified by the people on the 1st day of De-
cember, 1869, and during that year the State officers were
elected. Their term of office commenced on the first Mon-
day in January, 1870, by the very terms of our organic law;
and notwithstanding the fact that the act of Congress under
which the constitution was submitted to the people, pro-
vides that the State should not be completely restored to her
place in the Union until Congress had approved the act of
the people, and so declared by an act to admit the State to
representation, it is apparent that the State constitution, as
to all its provisions possessing an inherent vitality, and
which did not require legislative action to put them into
operation, became the supreme law of the State on the very
day of its ratification. In fact the admission act itself recog-
nizes the legislature elected in 1869, and declares that the
performance of the acts required was a condition precedent
to representation of the State in Congress. The mere *acci-
dental* fact that the State officers were not inaugurated
until March, 1870, cannot, by any possibility, change the
commencement of the *first* political year under the consti-
tution.

Aside from this, the election held in 1869 was not a gen-
eral election under our constitution, which had not then
been ratified by the people, but was a *special election,
ordered by the convention;* and the Governor inaugurated in
March, 1870, was really inducted into office for the fraction
of the constitutional term of four years, commencing on the
first Monday in January, 1870, and terminating on the first
Monday in January, 1874. This conclusion derives great
force from the history connected with the present constitu-
tion of the State, with which the court is already familiar.

The constitutionality of the election law may be upheld
on several grounds disconnected from the plain view hereaf-

ter taken. The practical construction given to the law by all departments of the State for a period of four years, must be regarded by the court as conclusive.  In Stewart v. David, 1 Cranch, 299, the supreme court of the United States, say : " It is sufficient to observe that practice and acquiescence under it (the law in question) for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has indeed fixed the construction. It is a contemporary interpretation of the most forcible nature. This practical exposition is too strong and obstinate to be shaken or controlled. Of course, the question is at rest, and ought not now to be disturbed." This seems to have been the view taken by the court, in Rogers v. Goodwin, 2 Mass., 478; Bregham v. Miller, 17 Ohio, 446; and Johns v. Joliet & C. R. Co., 23 Ills., 207. The rule is peculiarly applicable to the case at bar, in which the question for discussion is only one of doubt, to give it all the force claimed by its advocates.

If the election held in 1873 be unconstitutional, then that of 1871 was unconstitutional, for it was holden under the same law. The result would be that all laws passed by the legislature in 1871 and 1872 are mere nullities, and all acts done and offered under them, absolutely void. It is scarcely possible to imagine the evils that would result from such a conclusion. Anarchy, confusion, civil war, perhaps, and a total shipwreck of the whole State government. If the act now contested is unconstitutional, then we have no election law, and no legislature, for the old legislature, if legally elected, could not hold over under our constitution. Their term expired by limitation on the 1st day of January, 1874, and there would be no power in the State to form another election law. The term of the present State officers would expire before any election could be held, and the machinery of the government at once be arrested. How would the advocates of the unconstitutionality of the election law provide for the emergency? If that question could be successfully answered, their argument might possess some force; but it

can not be answered, and this very fact is conclusive of the question. If it be said a convention of the people could be called, the answer is, the convention could not be called, and if it were, it could not meet the exigency of the case. The difficulty could only be solved upon the predicate that all power resides in the people, and when the legislature had, by misapprehension, suffered the government to die such a singular death, the people had a right to assemble, without any warrant in law, and, by a supreme effort, bring it again to life. Such a conclusion is fraught with untold evils, and the *argumentum ab inconviente* becomes irresistable ; especially when, as in this case, the law argues exactly with the letter of the constitution, and has been so long acquiesced in and recognized as the law of the land."

*G. E. Harris,* on the same side :

The counsel for plaintiff in error insist that the court below erred in sustaining the demurrer to the information. The main point relied upon in the case is, that the act of the legislature of May 17, 1871, fixing the time for the general elections of the State, is unconstitutional, which we deny. This raises a grave constitutional question, involving the vital interests of the people of the State. Our constitution, as finally ratified, contains, substantially, the following :

Art. IV. Sec. 2. Members of the house of representatives shall be chosen every second year.

Sec. 4. Senators shall be chosen every four years.

Sec. 6. The political year shall commence on the first Monday of January.

Sec. 7. All general elections shall be by ballot, and shall commence and be holden every two years, on the first Tuesday after the first Monday in November, until altered by law.

Sec. 8. Members of the legislature shall be elected as provided by law.

Art. V. Sec. 1. The chief executive of the State shall be vested in a Governor, who shall hold his office for four years.

In order to arrive at a proper conclusion in this case, it becomes necessary to inquire into the facts connected with the reconstruction of the State, for the case presents a question of both law and fact, and we cannot arrive at the year in which the State government went into effect, by virtue of a general election, without keeping the historical fact constantly in view, because the constitution is silent as to the year.

The act of May, 13, 1871, provides, among other things, that "all general elections shall be held in the several districts in each county, on the first Tuesday after the first Monday of November, 1871, and biennially thereafter, as required by the constitution of the State."

This is the first law we have, fixing the year for the general election. The constitution merely prescribes the *day* for holding the general elections, and the legislature prescribes the *year*, and thus completed the system contemplated by the framers of the constitution. The act of the legislature supplies and completes the constitution, by fixing the *year* in which the tenure of each elective office shall commence and terminate, and is in strict accord with section 7, article 4, of the constitution, without conflicting, or assuming to set it aside.

The plaintiff in error was elected county treasurer of Hinds county, in November, 1871, and at the first general election held after the State government went into effect, and was installed into office on the first Monday in January, 1872, and has held the office until the first Monday in January, 1874, making two full years, and now calls on this court to perpetuate him in office for the space of another year, and thus permit him to perpetrate a scandalous usurpation upon the people of the county.

It is insisted that by the law of the State the election of members of Congress is held on the even years, and the "general elections" on the odd years, giving us annual in-

stead of biennial elections, as prescribed by the constitution. Not at all. Each election is biennial, though they are held in different years. The election of members of Congress is not a " general election of the State, nor can the constitution of any State prescribe the time or manner of holding such elections. The constitution of the United States provides, article 1, section 4, " the times and places and manner of holding elections for Senators and Representatives, shall be prescribed in each State by the *legislature thereof, but the Congress may, at any time, by law, make or alter such regulation,* except as to the place of choosing Senators."

It will be seen that the power to control this question is conferred upon the legislature and upon Congress, and that the constitutional convention of the State had no power to act in the premises, and any attempt to regulate or control the question is a nullity, and that section 25 in the general provisions of our constitution is absolutely void, and in the exercise of the power conferred, Congress has already fixed the time for holding the election of members of Congress throughout the United States, for the sake of uniformity, to take effect in 1876, and has the power to change or alter that. If the " general election" of the State must conform to the congressional elections, for convenience, and our whole system be changed by the court, or even by an amendment of our State constitution, who is able to say that Congress will not interfere, for convenience, and by the exercise of the same power, change the system, and place us again in the same dilemma? The act of May 13, 1871, does not assume to set aside any provision of the constitution. The framers of that instrument prescribed the time for the first election, to ratify the constitution, elect State officers, and members of Congress, in June, 1868, which election in fact was held, but failed to ratify the constitution, but if the election then held had ratified the constitution and elected officers, as contemplated, then members of Congress would have taken their seats in the fortieth instead of the forty-

first Congress, and the elective officers of the State would have gone into office two weeks after the official promulgation of their election, say about the first of August, 1868, filling a fragmentary term of about three months, and then entering on their full term of office, on the first Monday in January, 1869. This is what was contemplated by the framers of the constitution, and hence the necessity of section 9 in the schedule, which was expunged, because the election failed to ratify the constitution. When, afterwards, the question was carried before Congress, and the President was authorized to order an election in 1869, it became unnecessary, in the fitness of things, to retain that section as part of the constitution of the State, and when the President came to issue his proclamation, he said, " it is understood that sections 4, 5, 6, 7, 8, 9, 10, 11, 12 and 13 of article 13, under the head of " Ordinances," are considered as forming no part of this constitution." They were not voted upon by the people of the State, and this because they were not suited to the existing State of things in 1869.

And when we consult the Code of 1871, we find, on page 668, these words: " Sections 4 to 13, inclusive, expunged;" and I insist that they form no part of the constitution; and yet will counsel insist that they have any vitality? if so, not as a part of the organic law, but only the force of a statute (and that is not admitted), and would be subject to repeal, and were repealed by the act of May 13, 1871. The constitution of the State, on the subject of elections, as on many other subjects, does not go into details, but pre-supposes the enactment of laws on the subject.

If the act of May, 13, 1871, is held to be unconstitutional, then we have no law on the subject, and all the officers of the State, in each and every county, elected in 1871, have held office two years without authority of law, and now they ask to hold over another year, by virtue of their election, under the same provision of law, which *they* say is void. It is a strange position, an argument that carries its own refutation; a glaring absurdity in the very nature of things.

If the election held in November, 1869, was a "general election," the State officers elected should have been installed into office on the first Monday in January, 1870, and there was nothing to prevent it, and if they were not installed until the February following, still their term of office expired on the first Monday of January, 1874. On the other hand, if that was a special election, then the fragmentary term was nearly four years, and terminated on the same day, because the act referred to is the only law on the subject attempting to govern or to regulate it. We search in vain to find any provision in the constitution that attempts to regulate or to fix either the commencement or the expiration of any elective office in the State.

The power conferred upon the legislature by the constitution, on the subject of elections, is a discretionary power, and the court will be loth to interfere with the exercise of a discretion on the part of a co-ordinate branch of the State government.

Again, it is insisted that the election held in November, 1869, was not held under the constitution. I insist that it was. We find in the act of Congress, of February 23, 1870, the following:

" *Whereas,* The people of Mississippi have framed and adopted a constitution or State government, which is republican; and *whereas,* the legislature of Mississippi, *elected under said constitution,* have ratified the fourteenth and fifteenth amendments," etc.

Thus we see the constitution took effect from the date of its ratification, and all the elective officers of the State had the same right to qualify themselves and be installed into office, that the legislature had on the first Monday in January, 1870, and at the beginning of the political year, and the term of office of all the State officers, including the Governor, would expire on the first Monday in January, 1874.

*J. A. P. Campbell,* for plaintiff in error, argued the case orally.

*J. S. Morris,* on same side, filed an elaborate brief.

PEYTON, C. J., delivered the opinion of the court:

This case comes up on writ of error from the judgment of the circuit court of the first district of Hinds county, dismissing an information in the nature of a *quo warranto*, filed on the relation of John M. Chilton against James Williams.

The facts set out in the information show that the relator, John M. Chilton, was elected on the first Tuesday after the first Monday in November, 1871, treasurer of said connty, under an act of the legislature, entitled " an act in relation to elections, approved May 13, 1871," and that he duly qualified, and on the first Monday of January, 1872, entered upon said office and discharge of the duties thereof, and continued to do so, until the defendant, James Williams, entered and took possession of the same.

The information further shows, that said Williams was elected under said act, on the first Tuesday after the first Monday in November, 1873, treasurer of said county, for the term of two years from the first Monday in January, 1874, and that he duly qualified as such, and entered into said office and upon the discharge of the duties thereof.

Chilton claims that he is entitled, by virtue of his election in November, 1871, to hold said office until the first Monday in January, 1875, and asserts that Williams is an intruder into said office and usurps the same.

Williams appeared and filed a demurrer to the information, which was sustained by the court, and the information dismissed. And this action of the court is here assigned for error.

This case involves two questions:

1. Was the election in November, 1873, a valid election?

2. Was Chilton, by virtue of his election in November, 1871, entitled to hold the office of treasurer of said county until the first Monday in January, 1875?

I have given these questions that mature and deliberate consideration, which their gravity, magnitude and importance demand.

By the act of secession, the relations of this State to the nation, if not destroyed, were at least suspended. These relations could be restored only upon the terms prescribed by a series of enactments by the Congress of the United States, commonly called the reconstruction acts, the history of which I do not deem it necessary, on this occasion, to give in detail. These acts required, for the purpose of the rehabilitation and restoration of the State to her former, rights in the Union, that the people thereof, in the first instance, should frame and adopt a constitution of government republican in form and character, and with that view and for that purpose, the people of the State called a convention, which framed a constitution that was submitted to them for their ratification or rejection, and which was rejected by them. It was then referred to Congress, and after the objectionable provisions were stricken out of the constitution, it was again submitted by the President of the United States, to the people of the State at an election held on the 30th of November and 1st day of December, 1869, under an act of Congress. Upon this re-submission, the constitution, thus pruned of its objectionable features, was ratified and adopted by the people of the State on the first day of December, 1869. This act of Congress provides that at the same time that the people vote upon the constitution, they may vote for and elect the members of the legislature and all the State officers provided for in said constitution, and members of Congress. Under the authority of this Act, the people, at the same time they adopted the constitution, did elect the members of the legislature and all the State officers and members of Congress.

The legislature thus elected convened early in January, 1870, and organized, and on the 15th of that month, ratified the 14th and 15th amendments to the constitution of the United States, as required by said reconstruction acts. And on the 23d day of February, 1870, Congress passed an Act to admit this State to representation in the Congress of the United States. Early in March, 1870, the Governor was

installed into office, and the State officers entered on the
discharge of the duties of their respective offices, and thus
the machinery of the State government was put in opera-
tion.

It is assumed in argument by the counsel for the plaintiff,
that the constitution did not go into operation as a State
constitution until the 23d of February, 1870.  This position,
it is believed, cannot be maintained.  In order to a com-
plete restoration of the State to her former relations to the
Federal Union, the said acts of Congress required that she
should do two things, to-wit: adopt a constitution of gov-
ernment republican in form and character, and ratify the
14th and 15th amendments to the constitution of the
United States, which had been submitted to the legislatures
of the States for their ratification.  These amendments, as
submitted, can not be ratified without a legislature, and a
legislature can not exist without a constitution in full force
and operation.  If it be true as insisted by counsel, that
the constitution was inoperative until Congress declared by
a legislative act that the State is entitled to representation
therein, lamentable indeed would be her condition, for
she never could have representation in the Congress of the
United States.  Because the ratification of these amend-
ments is made a condition precedent to the passage of such
an act.  And this is clearly evidenced by the preamble of
the act of Congress of the 23d of February, 1870, which is
as follows: "Whereas, the people of Mississippi have framed
and adopted a constitution or State government which is
republican: And whereas, the legislature of Mississippi,
elected under said constitution, have ratified the fourteenth
and fifteenth amendments to the constitution of the United
States: And whereas the performance of these several acts
in good faith, was a *condition precedent* to the representa-
tion of the State in Congress."

The constitution was in full force and operation as the
fundamental and organic law of the State, from the time of
its ratification and adoption by the people, subject to be

rejected by the paramount authority of Congress; and as it has never been rejected by Congress, it has always continued in full operation, without interruption, from the time of its ratification and adoption by the people to the present time.

The adoption of a constitution, which is republican, and the ratification of said constitutional amendments to the Federal constitution were, as before stated, the only conditions precedent to the right of the State to representation in Congress. When these conditions were performed on the 15th day of January, 1870, her right to representation became perfect and complete. But this right, however, was suspended as to its enjoyment by the 7th section of the act of Congress, approved, April 10, 1869, until Congress ascertained the performance of these conditions precedent, and declared that this right may be enjoyed, which was done on the 23d of February, 1870.

Counsel rely upon the case of Leachman v. Musgrove, 45 Miss., 511, in support of the position that the constitution did not take effect and go into operation until the 23d of February, 1870. No support for such a proposition can be derived from that case. Upon examination of the case, it will be found that no such case was presented by the record, nor any point made as to when the constitution took effect. Whatever the judge said upon that subject in delivering the opinion of the court, is extra-judicial, as wholly unnecessary for the decision of the actual point, which was before the court. The question for decision in that case was, whether Leachman, as a judge *de facto*, was entitled to compensation as such, from the 25th of March, 1870 to the 11th of May, next, following. From this it will be seen that the question as to the time when the constitution went into operation could not properly arise in the case, and was entirely unnecessary to the decision of the cause. The language of the court is to be read with a view to the facts of the case, and any thing said by the court, outside of them, are mere *obiter dicta*, aud of no authority. Long experience has shown that nothing is more dangerous than to rely upon abstract reason-

ing of courts, when cases before them did not call for the application of the doctrines which their reasoning is intended to establish.

The 6th section of the 4th Article of the constitution, provides that the political year shall begin on the first Monday in January. This fixes the commencement of the term of all officers who are elected by the people, of both county and State. The members of the legislature and all the State officers elected at the time of the ratification of the constitution, came into office under that constitution, and hold their offices for the term prescribed therein. The members of the house of representatives of the legislature hold their office for the period of two years, and senators for four years, in accordance with the second section of said fourth article of the constitution, from the first Monday of January, 1870, to the first Monday of January, 1872, and 1874. And that the State officers hold their offices for the term of four years, from the first Monday in January, 1870 to the first Monday in January, 1874. The term of all these officers commence on the first Monday of January. without regard to the time when they may be respectively installed into office. It may sometimes happen that the officer elect, from sickness or other cause, is not inducted into his office until some portion of his term has expired, in that event the officer serves only the balance of his term. And all the officers elected by the people, except the Attorney General, hold over their term, until their successors shall be duly qualified to enter on the discharge of their several and respective duties, under the 22d section of the 5th article of the constitution.

The 7th section of article 4, requires that all general elections shall be by ballot, and shall commence and be holden every two years, on the first Tuesday after the first Monday in November, until altered by law. Inasmuch as the constitution is silent as to the year in which the election is to be held, it necessarily devolved upon the legislature to determine the year in which the general election shall be

held. And in the performance of this duty, they on the 13th of May, 1871, passed an act in relation to elections, under which the plaintiff was elected on the first Tuesday after the first Monday, in November, 1871, Treasurer of the County of Hinds, who held his office for the term prescribed in the constitution, commencing on the first Monday in January, 1872, and ending on the day previous to the first Monday in January, 1874. And under the same act of the legislature, the defendant was, on the first Tuesday after the first Monday in November, 1873 elected to the same office. And this election is impeached by the plaintiff, on the ground that the said act of the legislature was unconstitutional and void; because the act declares that an election shall be held for representatives in the Congress of the United States, on the Tuesday, next, after the first Monday in November, 1872, and biennially, thereafter. This brings on an election every year, which, it is contended, is in violation of that provision, which requires that all general elections shall be held every two years. It is true that an election of members of Congress, in the intervening years of the general election of State and county offices, necessitates an election every year, which is much to be regretted. But this fact, by no means produces the effect of rendering the act unconstitutional. They are elections for very different officers. The officers when elected are to perform their functions in different governments. These respective elections come off every two years under the act, and cannot violate the constitution which provides for elections every two years.

The general elections of State officers are those contemplated by the constitution. The time of holding elections for members of Congress may be regulated by Congress, and in the absence of their exercise of that power, the State legislature may exercise it, and prescribe the time when they shall be elected, which was done by the act under consideration. Suppose that Congress had provided for the election of members of Congress from this State, at the time pre-

scribed in the legislative act under consideration, would that have made the act unconstitutional? Certainly not. Then why should it have that effect, when the legislature has supplied the omission of Congress to prescribe the time for the election of members to the national legislature.

The act under consideration provides that a general election shall be held in the several districts in each county on the first Tuesday after the first Monday in November, 1871, and biennially thereafter, as required by the constitution of this State. At this election those officers who hold for two years shall be elected, and those officers who hold for four years shall be elected and quadriennially thereafter.

Counsel for the plaintiff contend that this act, although it apparently provides for a general election, was really intended to provide for a special election, to elect those officers who were appointed by the Governor, under the 6th section of article 12 of the constitution. That section provides that those officers shall continue in office until the legislature shall provide by law for their election. The legislature did provide by this act for a general election of all officers, both of State and county, who hold office by election by the people, and the offices held by these appointees, were filled at the first general election held under this act in November, 1871. And therefore the position assumed by counsel cannot be maintained. There is a well-known distinction between general and special elections. A general election is for the election of officers for the full term, and a special election to fill an unexpired term of an office which has become vacant by death, resignation or otherwise. It is assumed that the act is valid as an act authorizing a special election, but void as authorizing a general election. This positition, it is believed, is likewise untenable.

If the act be constitutional, as I think it is, it follows that the election of November, 1873, to which no objection is made, except on the ground of the invalidity of the act under which it was held, is valid, and that the defendant is

entitled to the office to which he was elected at that time, for the term prescribed in the constitution.

This brings me to the consideration of the second question, which is, was Chilton, by virtue of his election in November, 1871, entitled to hold the office of treasurer of said county until the first Monday in January, 1875? If, as insisted on the part of plaintiff, the act authorizing the election is void, instead of a right to hold the office until the first Monday in January, 1875, he was not entitled to hold it at all. He could be nothing more than a mere officer *de facto*, without any legitimate right to the office. But 'if he was an officer *de jure*, as I think he was, he had a right to hold the office until the first Monday in January, 1874, and until his successor was duly qualified to enter on the discharge of the duties of said office. And this right of an incumbent to hold over his term until his successor was qualified to discharge the duties of the office, was intended to prevent the public inconvenience that might occasionally occur from a vacancy in the office even for a short interval of time. The successor must exist at the end of the term of the incumbent, to justify his holding over his term, and this holding is to continue but a few days, or, at most, a few weeks, within which the successor may give his bond, if bond be required, and take the oath of office. It was not intended by the constitution that an incumbent of office should hold the same beyond the time prescribed by the constitution, until his successor shall be *appointed* or *elected* and qualified. (This applied to the Governor's appointees, only, and to no other officers whatever. No officer specified in the constitution has any right to hold over his term, unless authorized to do so by the constitution. Any act of the legislature, attempting to do so would be unconstitutional and void.

Even if such a thing could be, as contended for, that the election in November, 1871, was valid, and that held under the same act in November, 1873, was void, on the ground that the act was unauthorized by the constitution, the con-

sequence would be that we would be without a legislature, the government would be disorganized, and we would be in a labyrinth of difficulties without the thread of Ariadne to conduct us out of it. For it will hardly be contended that the legislature can hold over the term of two years prescribed for its existence in the constitution. There is no such thing as a legislature holding over until the succeeding legislature is qualified. The reason for holding over in certain offices does not apply to the legislature. Without this department, the government could not be conducted. Its machinery being thus deranged, it would cease to operate, and confusion and anarchy would prevail, without any means at hand to arrest the evils that would naturally flow from such a state of things.

If the act be unconstitutional, the legislature elected under it would be illegal and without authority to legislate, and the acts passed by them for the last two years, under which we have been acting, are void, and of no binding force or efficacy. To avert such consequences, if the constitutionality of the act were even doubtful, the well recognized rule of construction of statutes solves the doubt in favor of the validity of the act in question. But as I entertain no doubt of the validity of the act, there is no necessity to invoke that wise and salutary rule of construction.

The judgment must be affirmed.

SIMRALL, J., delivered the following concurring opinion:

The question is, whether the election law of 13th of May, 1871, is constitutional or not. Invalidity is affirmed on several grounds. That it conflicts with the provision appointing biennial general elections, with the section which fixes the first of January as the beginning of the political year; with the sections determining the terms of officers. It was attempted to be maintained in argument in support of this view, that the terms of the Governor, Secretary of State, Auditor, etc., continued until the first Monday of January, 1875; that the legislators elected in November, 1871, held

over until the same day; that a general biennial election could not have been holden before November, 1872, and that the law providing for such election in November, 1871, is in violation of the constitution, and that elections held under that statute are illegal, and did not, and could not, legally confer the offices upon the persons respectively chosen.

The parts of the constitution referred to as having relation to the questions, are these:

. The house of representatives shall consist of members to be chosen every second year.  *  *  Art. 4, sec. 2.

The political year shall begin on the first Monday of January, and the legislature shall meet annually, on the first Tuesday after the first Monday in January, until altered by law. Art. 4, sec. 6.

All general elections  *  *  shall commence and be holden every two years, on the first Tuesday after the first Monday in November, until altered by law. Art. 4, sec. 7.

Elections for members of the legislature shall be held  *  *  *  as provided for by law. Art. 4, sec. 8.

The chief executive power  *  *  shall be vested in a Governor, who shall hold his office for four years. Art. 5, sec. 1.

When the office of Governor shall become vacant, by death, resignation,  *  *  the Lieutenant Governor shall possess the powers and discharge the duties of said office  *  *  *  during the *remainder of said term.* Art. 5, sec. 17.

The Secretary of State, Treasurer, Auditor, shall " continue in office during the term of four years "—" shall hold their offices for the term of four years." Art. 5, sections 19 and 20.

The Sheriff, Coroner, Treasurer, Assessor and Surveyor  *  *  shall hold their offices for two years, unless sooner removed. Art. 5, sec. 21.

All the officers named in article 5 shall hold their offices *during the term* for which they were elected, unless re-

moved, * * and until their successors shall be duly qualified. * *

The political year * * * shall commence on the first Monday of January, in each year; and the general election shall be holden on the first Tuesday succeeding the first Monday in November, biennially.

Representatives in Congress, to fill existing vacancies, shall be elected at the same time this constitution is submitted * for ratification, and for the full term next succeeding their election; and thereafter elections for Representatives in Congress shall be held biennially. Art. 12, sec. 25.

The most plausible arguments against the validity of the election law of 1871, and of the right to offices of those chosen at elections held under it are drawn from those provisions of the constitution appointing the first Monday of January as the beginning of the political year, and fixing the terms of the several elective officers.

To give any effect to the section naming the first Monday of January as the beginning of the political year, it must be taken as referring to a definite period, when the terms of the elective officers should begin, both State and county. When, then, did the first political year begin under the constitution? Was it the first Monday of January, 1870, or 1871? The arguments of the disputants of the law and the validity of elections under it, is, that it is the first named, because the work of reconstruction was not declared by Congress to have been completed until the passage of the "admission act" of the 23d of February, 1870.

This subject, like others growing out of the late attempted revolution, must be considered in the light of the great events of contemporaneous history.

The "re-submission act" bears upon it internal evidence that Congress supposed that the people had rejected the constitution in June, 1868, without sufficient deliberation, or because it contained some special obnoxious features; therefore it authorized the President to submit to a second vote,

either to be ratified as a whole, or shorn of the objectionable features.

So confident was Congress that the popular vote would result in the adoption of a constitution, that at the same election the people were directed to vote for a Governor and other State officers, members of the legislature, and Representatives in Congress. See fourth section of act of Congress, 10th April, 1869.

If the constitution shall be ratified, then the legislature shall assemble on the fourth Tuesday after the official promulgation of such ratification. 5th section of same act. This evinces a desire on the part of Congress that reconstruction shall be speedily finished. Pursuant to this law, the vote was taken, official proclamation made of the ratification, and the legislature assembled Tuesday, the 11th of January, 1870. It ratified the fourteenth and fifteenth amendments to the constitution of the United States, elected Senators, and on the 20th of the month adjourned until the second Tuesday " after (as expressed in house resolution) the admission of the State into the Federal Union." The two houses re-convened on the 10th of March, " the admission act having passed " the 23d of February previous. It has been uniformly declared by the political departments of the national government, and repeatedly affirmed by the supreme court of the United States, as a legal and constitutional fact, that the act of secession, and the war which ensued, did not withdraw and separate Mississippi as a State from the Union, but that for a time Federal laws and authority were suspended and unenforced in the State.

The judicial relations of the State, under the constitution, had already been restored, and were operative before the reconstruction laws were passed; the circuit courts and district courts of the United States had been opened, and writs of error lay to them from the supreme court of the United States. The precise thing to be done, and all that remained to be done, was to restore the political relations, that is, admit the State to representation in Congress. As to that,

the State had been put upon terms under the reconstruction laws.

What was the character of the legislature which assembled in January, 1870, and what was it competent to do? It was assembled pursuant to an act of Congress, but it was none the less a body, composed of the two houses, of Representatives and Senators, constituted under article 4 of the constitution. It could not exert plenary legislative power, because it was convened solely to take part in the work of reconstruction, by passing upon the fourteenth and fifteenth amendments to the constitution of the United States, and the election of Senators, so that, when Congress declared reconstruction accomplished, the State, without delay, might have representation in both houses of Congress.

An amendment to the constitution of the United States may be ratified by the legislature of a State; but the body exercising this, the highest and most important discretion that may be referred to it, must be constituted and organized in conformity to the fundamental law of the State. Such, too, must be the character of the body which elects Senators to Congress. The "submission act" and the "resubmission act" both recognize the two houses of the legislature as a constitutional body, competent to discharge these two duties. It cannot be affirmed of this body that it was elected to discharge its functions under the ratified constitution of 1869, except it be also conceded that the Representatives were chosen under the fourth section of article 2, for two years, and the Senators under the fourth section, for four years; and also that the Governor and other elective State officers were chosen for four years. If the legislature which, in January, 1870, ratified the constitutional amendments and elected Senators, was not the regular, legal body, provided for in the constitution of 1869, two consequences must ensue, both of which are absolutely unreasonable. The first is, that it was an anomalous and extraordinary body, called into existence by Congress, for defined and special purposes, after acting upon which, its

VOL I—43

functions ceased,.and it became dissolved.   The second is, that Congress may submit, for ratification, a constitutional amendment, to a body which is not, according to our system of government, a State legislature, and accept its action as of force in the premises.   The third is, that Senators in Congress may be admitted to their seats who have not been elected by a legal State legislature.

This legislature did not, and could not, enter upon general legislation, because the seventh section of the "re-submission act" declared "that the proceedings of any of said States shall not be final or operative as a *complete restoration* thereof until such action shall be approved by Congress;" and because the act of 2d of March, 1867, would not cease and be inoperative until the plan of reconstruction had been fulfilled.   The text is: "When the people of any one of said States shall have framed a constitution republican in form, in conformity to the constitution of the United States, * * and such constitution shall have been ratified, * * and when a vote of its legislature elected under said constitution shall have adopted the fourteenth amendment to the constitution of the United States (the fifteenth amendment was, by subsequent act, included), * * * and when said State shall be declared entitled to representation in Congress, and Senators shall be admitted therefrom, * * then and thereafter the preceding sections of this act shall be inoperate in this State."   5th section of first reconstruction act of 2d March, 1867.   See, also, section 6 of act of 10th April, 1869.

Such is a summary of these most important transactions, with a statement of some of their legal consequences.   The pith of the whole matter is: Adopt, by popular vote, the constitution; elect legislators, and the great officers therein provided for; assemble the legislature thus elected; ratify the fourteenth and fifteenth amendments to the national constitution; and the State shall be restored to her normal political relations in, and to the government of the United States.   Such was the offer made by Congress.   The State

accepted and complied, and thus the broken link in the political connection was re-united by the admission of Representatives and Senators to their places in Congress.

Pending these proceedings, and until this last final consummation, the Governor and other State officers elect could not enter upon the enjoyment of their terms, nor, of course, could ordinary legislation be had.

The constitution is of force because of its ratification by the people in December, 1869. Congress retained, as we have seen, the right to hold the proceedings of the State in abeyance, in a suspensive condition, until the terms were complied with; and it so declared, by admitting the members of Congress to their seats. But when Congress accepted what was done, the constitution was the organic law by virtue of the popular ratification, and the Governor and other State officers and members of the legislature were entitled to their several offices under the constitution, by virtue of their election in December, 1869.

The *first Monday* of January, 1870, came before the declaratory act of Congress, and before the State offices could be entered upon. That is the time intended by the constitution for the terms of elective officers to begin. If the "admission act" could, in the nature of things, have been passed before January, 1870—or, in other words, if the State could have been fully restored before that time, then it would be agreed on all sides that on the first Monday of January, 1870, would have begun our political years and the terms of officers; which interpretation of the constitution will best harmonize the instrument in all its parts—that which shall construe the first political year as beginning the first Monday of January, 1870, or the like day in 1872. It must be kept in mind that there is a palpable distinction between a "term" and the time when it is entered upon; between the "term" of an officer, and the time when it is taken possession of. The constitution intends a point of time when the terms of all officers begin and end. It is in that view—where the office becomes elective and is vacant

before it has expired—that a special election must be held, to provide an incumbent for the unexpired term. If the appointment be in the Governor and Senate, vacancies, or unexpired terms, are filed by nomination and confirmation. Thus, art. 5, sec. 1, the Governor shall hold his office for " four years," which means that his " term " shall have that duration. The Secretary of State shall " continue in office during the term of four years." The Auditor and Treasurer " shall hold their offices for the term of four years." Art. 5, §§ 19–20. Again, all officers enumerated in article 5, which includes Governor, Auditor, Treasurer, Secretary of State, and all the county officers, shall hold "*during the term* " for which they were elected, and until their successors are qualified. 21 sec., art. 5. Construing these several sections together, and there are two ideas and purposes distinctly presented: First, that there is a " term," a " distinct duration of time," annexed to each office; the second is, that the officers may lawfully hold, in addition to the " term " or " time " embraced in it until their successors are duly qualified, and that for the manifest purpose of preventing a cessation of authority in executive and ministerial officers. The 1st section of article 5, organizing the executive department, is, " that the Governor shall hold his office for four years." That, in the constitutional sense, is his " term," but if, from any hindrance or casualty, his successor elect can not enter upon his term immediately after the expiration of the former, the incumbent shall hold until he does so. The Governor shall hold his office for " four years." Sickness or accident may prevent his successor, for one, two, three, or four months, from taking possession of his office. If so, the incumbent holds on, and consumes that much of his successor's term; and yet the term thus encroached upon has already begun, and the four years term has partially elapsed. If the incumbent extends his holding over two weeks or months after his term of four years has gone, it does not enlarge *pro tanto* the term of his successor; nor, in the technical sense, does it abridge it. The legal idea is,

the term commences on a given day and terminates on a certain day ; and although the successor elect may not qualify and take the office until long after the term has begun, yet it is his term, and expires at the day appointed. Turning to the provisions in regard to members of the legislature, and it will be more manifest that the theory of constitutional interpretation which would invalidate the election laws, is erroneous and unsound. The general election shall be biennial; representatives shall be chosen every second year, and senators every four years. The effect is to make the term of the representatives two years, and that of senators four years (whether it shall begin from the election, or the first of January thereafter, is immaterial to the argument). There is no provision in the constitution for representatives and senators to hold one moment of time after the two and four years for which they were elected has expired. It will hardly be denied that the representatives chosen in 1869, were elected for " two years." They met for special purposes, 10th of January, 1870, and re-assembled for all legitimate purposes the 10th of the ensuing March. The two years began either from their election or the 1st of January thereafter. If it be held that their " term " commenced the first Monday of January, 1871, then three sequences ensue, neither of which have support, either in the constitution or reason: First, that they could enter upon legislative duties before their term commenced; for they did actually sit and make laws, and adjourned their first session without day, before January, 1871. Second, that they were elected for a longer term than two years; for, upon this theory, they would not go out of office until January, 1873. Is that a reasonable rendering of the constitution? Does it not do violence both to the letter and intendment? But the legislature must meet annually. Upon this theory, the legislature elected in November, 1871, and which commenced its session the ensuing January, were an illegal body, usurpers, assuming to make laws without right; for during the entire first year of their term, the members elected in 1869

were in office and were entitled to be in until 1873, or No-
vember, 1872.   And, if all that be so, what becomes of the
laws enacted by the legislature elected in 1871, and the
judicial and other proceedings had under them?   That con-
struction places us in the dilemma of confusion and anarchy.
What is the extrication?   None has been suggested; none
can, it is presumed, be suggested, except to convene the
legislature elected in 1871, to supply an election law in the
place of the invalid statute of 13th May, 1871.   But that
would be little short of revolutionary; besides, the mode of
relief is beset with insuparable difficulties.   The legislature
proposed to be assembled came into existence at an uncon-
stitutional election, held under an invalid law.   But, waiv-
ing that, their term of two years has expired, and there is
no provision of constitution or statute that allows representa-
tives and senators to meet together and pass laws after the
time for which they were chosen has elapsed.

If we hold the law of 1871 to be unconstitutional, and the
elections held that year and in November, 1873, to be illegal,
then it seems to me that we have no means or plan known
to the constitution, or the American system of government,
by which we can bring into existence another legislature.

The perpetuity of the law-making department, is kept up
by the biennial elections.   There is no necessity that sena-
tors and representatives should hold over, their right to
office is determined by a local board, which acts promptly
after the election.   A quorum of those elected, is competent
to organize and transact business.   Though one or ten,
absent themselves, it does not interrupt the proceedings
of either house.

As to the Governor, Auditor, Treasurer, Secretary of State,
the needs of the public, the nature of their respective
duties, demand that these offices shall perpetually have
incumbents, and hence, provision is made for a delay in
entering upon them.   Not so, however, with the members
of the legislature who have no duties to perform except
when in actual session, which is but a short time in each

year. So severely did this aspect of the subject press upon counsel that it was conceded, that no other validity attached to the legislature elected in 1871, than as *de facto* incumbents. Nor if they met to repeal the election law, would they have any other or better right. Is there, or can there be, such a body as a *de facto* legislature. There may be a *de facto* representative or senator, one who sits and votes, without title to membership. A *de facto* officer is one who by color of right, has got possession of an office. If he continues quietly to exercise its functions, third persons, and the public who have an interest in his acts, are bound by them. He is said to hold at the sufferance of the government, whose silence and acquiescence is construed as a ratification of his acts, but not of his title. Kimball *et al.* v. Alcorn *et al.*, 45 Miss., 157. The remedy which the government has to eject a *de facto* incumbent, is by the writ of *quo warranto*. Can such a writ go against the senate and house of representatives?

But it was said at the argument that the election law is valid, and the election held in November, 1871, is good so far as all the county, precinct and district officers are concerned, and this under sec. 6, of the 12th art., that as to such officers it was a special election. Is that correct? The legislature under that section might have ordered in 1870, a special election for such officers, but they could only have held until their places could be filled at the next general election. This section, as held in Kimball v. Alcorn, *supra*, and in the supervisors case, 44 Miss. Rep., was only a temporary expedient, which would soon pass away, and cease to be operative as a part of the constitution. If the legislature failed to provide, as it did for a special election, then the Gubernatorial appointees would continue in office until their successors should be chosen at the first ensuing general election. That section having accomplished its purpose, has ceased to have effect. There are but two sorts of elections known to the constitution and laws, general and special. The former to fill offices for the full term, the latter to sup-

ply incumbents for some portion of it, unspent, occasioned by resignation, removal, or death. Indeed there was no part of a term, as provided in the permanent sections of the constitution, that could have been filled at that election. But if the construction of the constitution, which I have submitted as correct, and harmonizing its several parts, should not be satisfactory, other considerations ought to be conclusive. The utmost that can be said of the question, is that it admits of doubt. The government, in all its political departments, has accepted, adopted, and acted upon the construction of the constitution, which I have suggested. The organization of the departments, the election law, the succession to the elective offices, legislative, and ministerial, at least for the two years term have proceeded upon that as the true theory. It is too late now, to re-open and reconsider the subject. This practical interpretation of the meaning and intent of the constitution, would well warrant this court in esteeming itself concluded thereby. Concluded unless the practice was clearly and palpably a violation of the instrument, and an easy, and legal mode of returning to a more regular and correct practice, was plainly revealed. Surely a practical interpretation by the departments of government so long acquiesced in, ought to be of weight enough to solve a doubt.

If a construction variant from that which has been acted upon would produce confusion and anarchy, not to be recovered from, except by a resort to extraordinary and extra constitutional means. The argumentation and reasoning which would conduce to it, must be inherently bad, and however plausible, could not be relied upon by a court as the basis of a judgment.

It has not been insisted that the statute of 1871 is upon its face unconstitutional. It proposes thereafter to order the elections according to the terms of the constitution. It directs a general election in November of that year, for representatives and for senators whose terms have expired, and for county officers, and directs the next general election for

1873, when the Governor and other State officers shall be chosen. If this law is continued as operative, there will be, and can be, but biennial elections for State officers, as contemplated by the constitution. The biennial elections referred to, are to fill State offices. The convention could not fix absolutely and permanently the time of electing representatives in Congress, because paramount authority over that subject resides in Congress. The 4th section of art 1st, of the constitution of the United States, is as follows: " The times, places and manner of holding elections, for senators and representatives, shall be prescribed in each State by the *legislature* thereof; but the Congress may, at any time, by law, alter such regulation, except as to the place of choosing senators." The Congress may alter, at its pleasure, any regulations (laws) made by the State, including the " times" of electing representatives.

This power, Congress has already exerted, which will, when it takes effect, supersede state regulations, whether made by their constitutions or statutes.

It may be inconvenient and more expensive to hold an election one year for representatives in Congress, and the next for State officials; but that does not take from the latter its character of biennial, nor make it unconstitutional.

It is fair to assume, and such in my opinion is the proper solution of the subject, that the legal import to be given to the election of 1869, is that the legislators, Governor, and State officers, then chosen, were elected for the terms respectively assigned to them by the constitution, but as it was uncertain as to the time when Congress would pass the admission act, the enjoyment of the whole terms might not be had. That was undoubtedly the view of the Governor and legislature, who fully organized and put in motion the entire State machinery under the constitution. The idea is clearly presented in the constitution, that the term of an office may begin before the individual entitled enters the office. Thus the intendment is, that the Governor shall serve for four years, beginning on or about the inception of the politcal

year, but he cannot enjoy the office until after that day—
the duration of the postponement dependent upon the meet-
ing of the legislature, the day of the week the election re-
turns are counted, and other contingencies, such as sickness
or other unavoidable casualty.

This shows that there may be insuperable difficulties in
taking possession of the office at the commencement of the
term. And it gives support to the argument, that the objec-
tion taken to the first Monday in January, 1870, as the be-
ginning of our political years, is not insuperable, because
the Governor, and other officers of the State, could not then
be inducted into their respective places.

It was strongly pressed in the argument, that the case of
Musgrove v. Leachman, 45 Miss. Rep., 511, maintained a princi-
ple adverse to the constitutionality of the election law. The
question there presented, was, whether a circuit judge, ap-
pointed by the military commandant, who continued to dis-
charge the functions of office, after the 22d of February,
1870, could rightfully do so, and was he entitled to pay?
The Auditor objected and refused to issue his warrant for so
much of the salary as accrued after the 25*th of March*, hav-
ing done so for the anterior time. It was held that Leach-
man, during the time involved, must be considered as holding
office at the sufferance of the rightful government; or that
he was holding over under the law until a successor came to
relieve him. The argument of the opinion is addressed to
the point mainly, that the judges and ministerial officers
continued during all the period after the cessation of mili-
tary authority, and the induction of successors under the in-
coming government, in their places, and that their official acts,
if otherwise good, were to be respected as valid. Some pains
were taken to show that there could be no ground for doubt
or uneasiness as to the legality of judicial proceeedings
during this transition period.

The only objection made by the Auditor to the issuance of
the warrant, was, that Leachman had not taken a certain

oath (which we thought did not apply to him), and that he ought not to be paid in any event after the 22d of April.

It is stated in the opinion *arguendo*, that the military government expired on the 22d of February, 1870. It is true, historically, that the civil administration under the military commandant, as its chief and head, with the judges and other magistracy, continued until that day. The warrant so to do, is in the acts of Congress to which I have referred. That authority was modified by the re-submission act, and the proceedings had under it. Although the constitution was ratified in December, 1869, for the most part it did not become functionally operative, until the several departments of administration were organized under it, as the two houses of the legislature, in January, 1870, and the executive and judicial departments still later.

Restoration was progressive, having degrees, pauses and epochs. First the convention framing a constitution, then ratification by the people, then the legislature adopting constitutional amendments, and electing senators, then the admission of senators and represenatives in Congress, then the complete installment of the State administration. With the doings of none of these things could the military authorities interfere to hinder or prevent. Yet, there was apart from all these proceedings, much of authority to be administered to preserve order, protect rights, and administer justice during the time the successive acts of reconstruction were being performed. Though the military authorities continued for the purposes named, the people in a delegate convention, forming a constitufion and adopting it by popular vote, were exercising their most supreme right. So too, the legislature performed a constitutional function in ratifying amendments to the national constitution, and electing senators.

After careful consideration, I think these premises are true.

1. That the "re-submission act" implied a desire, and a pledge, on the part of Congress, to restore the State, speedily, to full and complete Federal relations, on compliance with the terms prescribed, which "desire" and "pledge" appears

in directing the election of State officers, at the same time with the vote on ratification.

2. That the Governor, members of the legislature, and others, then chosen, were elected for their respective terms prescribed in the constitution, and to discharge the respective duties therein enjoined.

3. That reconstruction was the co-operative work of Congress and the State, consisting of several distinct acts performed at different times, completed by the admission of reppresentatives in Congress. In these proceedings, the State, through a constitutional convention, and its legislature, was exercising regular and legal power.

4. That the first Monday in January, A. D., 1870, was the beginning of the first political year.

5. That the terms of the representatives and part of the senators, elected in 1869, had expired, after their term of two years was gone; and to continue the legislative department, a new election was properly ordered in 1871.

Therefore, the election law, of that year, is constitutional, and the elections, as arranged by it, are biennial; and the election held November, 1873, was legal, and the officers then chosen are entitled under the constitution to their respctive terms of office.

In conclusion, I will add, that in order that all parts of the constitution may be harmonized in administration, the annual sessions of the legislature should begin on the first Monday in January, or on the day named in the constitution, the " first Tuesday after the first Monday in January."

I am of the opinion that the judgment of the circuit court should be affirmed.